644 S.E.2d 684

**The STATE, Respondent,**

v.

**Bryan LADNER, Appellant.**

**No. 26310.**

Supreme Court of South Carolina.

Heard Feb. 14, 2007.

Decided April 23, 2007.

104

106

Appellate Defender Aileen P. Clare, of South Carolina Commission on Indigent Defense, Division of Appellate Defense, of Columbia, Patricia Ann Kennedy and Keshia V. White, of Berkeley Public Defenders, Inc., of Moncks Corner, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, and Assistant Attorney General Shawn L. Reeves, all of Columbia, and Solicitor Ralph E. Hoisington, of Charleston, for Respondent.

Justice WALLER.

Appellant Bryan Ladner was indicted for criminal sexual conduct with a minor, first degree. A jury found appellant guilty, and the trial court sentenced him to 14 years' imprisonment. Appellant directly appeals from his conviction. We affirm.

## FACTS

Appellant was charged with digitally penetrating the victim's vagina on October 31, 2003. The victim, at the time, was approximately two and a half years old.

After the jury had been selected, but prior to any testimony being taken, the State informed the trial court it was not planning to call the victim as a witness.[1] Instead, the State intended to introduce the victim's statement implicating appellant through the excited utterance exception to the hearsay rule. In response, defense counsel stated that the victim might be called in the defense's case-in-chief, and therefore, appellant requested a competency hearing. Appellant also made a motion *in limine* to determine the admissibility of the hearsay statement.

The hearing on the motion *in limine* proceeded, and the State put up Marla Jackson.[2] Marla testified that on Halloween 2003 at around 7 p.m., appellant and others arrived at her house to take the victim trick-or-treating. About one hour later, appellant returned the victim to Marla's house. Within approximately 45 minutes of the victim returning to Marla's house, the victim went to the bathroom and complained that her crotch area[3] hurt when she urinated. It was discovered that the victim was bleeding, so Marla laid her down in the bedroom and saw that she was red and swollen in her vaginal area. Marla asked the victim what happened, and the victim said, "Bryan did it." The victim then stated, "No, Bryan didn't do nothing."

The trial court ruled that the victim's statement to Marla identifying appellant as the perpetrator was admissible because it met all the elements of the excited utterance hearsay exception. Further, the trial court stated that the victim's

---

1. At the time of trial, the victim was approximately three and a half years old. The State indicated to the trial court that although it originally had planned on calling the victim as a witness, the State's position was that the child could not testify because of her tender years.

2. The victim was staying at Marla's house when the relevant events occurred. The relationships between the victim and her various caretakers will be further explained *infra*.

3. The child referred to her crotch area as her "tooch."

incompetency based on her youth would not bar admission under the excited utterance rule. Defense counsel then requested the competency hearing. The victim was questioned by defense counsel and so clearly demonstrated she was incompetent to testify that at the close of questioning, defense counsel conceded she was not competent as a witness. Appellant requested that the trial court reconsider its hearsay ruling, but the trial court again ruled the statement admissible.

The following additional facts were developed during trial testimony. Appellant lived with his fiancée Joanna Sweatman. Joanna had been the victim's primary caretaker until September 2003, when the victim was sent to Tennessee to be taken care of by Joanna's mother, Eloise Cales.[4] Eloise traveled with the victim back to South Carolina on October 30, 2003. Arrangements were made on that day for Joanna and appellant to take the victim trick-or-treating the next evening.

Marla was the State's primary witness. She testified that she was an "aunt figure" to the victim. Marla drove Eloise and the victim from Tennessee to South Carolina the day before Halloween 2003; both Eloise and the victim stayed at Marla's house on October 30 and 31. Marla described how she got the victim ready for trick-or-treating around 6 p.m. on October 31:

[B]efore I put her panty hose on, I took her pull-up[5] off and washed her down because she had peed in her pull-up that we originally put on her after she had taken a bath earlier and I had to wash her, wipe her down and then put a new pull-up on her before I put her tights on her.

The victim was outfitted as a princess for Halloween: she had on a dress, make-up, and tights as her costume.

---

4. Both Joanna and Eloise were defense witnesses. Eloise testified that the victim's mother was "unable" to take care of the victim and asked Joanna to take care of her. Joanna testified that her brother was dating the victim's mother "and he didn't want a baby in the house so they brought her to me and gave her to me and asked me to keep her." Joanna explained that she was paid to take care of the victim and she did so for approximately one year.

5. A pull-up is similar to a diaper and is used by toddlers who are not fully potty-trained.

Around 7 p.m., Joanna picked the victim up from Marla's house; appellant was driving, and several others were in the car. Appellant drove the group to a neighboring subdivision to go trick-or-treating. Between 7:45 and 8 p.m., appellant returned the victim to Marla's house. Marla testified that she was on the porch giving out candy when the victim returned, and she noticed the victim had been crying because her face was red and her make-up was smeared.

Appellant explained that he brought the victim back because she was having a temper tantrum. According to Marla, appellant did not even stay two minutes at her house. Eloise came to the door and took the victim inside. Shortly thereafter, Marla also went inside the house. The victim sang a couple of songs, karaoke-style. After her singing, while sitting on the couch, the victim grabbed at her crotch and said she had "to pee." Eloise took her in the bathroom, and Marla went in to "find out what was going on." Eloise wiped the child and noticed blood on the toilet paper.[6] She told Marla to take a look at the victim. Marla testified as follows:

> And me and my mom and Eloise was [sic] in the room and [the victim] was all red in her crotch area and swollen and she had scratches all behind her legs. She had a hand print—a large hand print on her arm, a larger hand print on her leg. She had scratches around her wrist. **And I asked her what happened, because she said her tooch hurt, and I asked her what happened and she said, Bryan did it. And then she goes, No, Bryan didn't do nothing, Bryan didn't do nothing.**

(Emphasis added).

The victim was taken to an emergency room and treated by Dr. Charles Staples. Qualified as an expert in sexual assault examinations, Dr. Staples testified the victim had bruises on her left cheek, arm, and inside thigh; his vaginal exam revealed redness. In Dr. Staples' opinion, the victim's injuries were consistent with sexual abuse that was acute, i.e., it had occurred in the previous 12 to 24 hours.

The victim was transported to, and examined at, Carolina Medical Assessment Center for a full sexual assault examina-

---

6. Blood was also observed on the victim's pull-up.

tion. Dr. Elizabeth Gibbs, who was qualified as an expert in child sexual examinations, testified that her examination occurred around 1 a.m. on November 1, 2003. She reported that the victim's left leg had been constricted from her left leg being held up. Regarding the victim's vaginal injuries, Dr. Gibbs testified that the area was extremely swollen, there was a laceration on the left side, and bleeding was coming from the hymen. She also stated the victim was in a great deal of pain from the vaginal injuries. Dr. Gibbs opined the victim had suffered a blunt force penetrating injury to her vagina that had occurred within 24 hours of the time of examination. Moreover, Dr. Gibbs stated that although cases of digital penetration generally present with much less trauma than this victim had, her injuries nonetheless could have been caused by digital penetration.

Based on the victim's identification of appellant, the police interrogated appellant in the early morning hours of November 1, 2003. He gave two statements to Detective Aldo Bassi. In his second statement, appellant wrote the following:

> [the victim] was tired and crying so [Joanna] asked me to take her home. She put [the victim and another child] in the car. [The victim] was crying [hysterically] and from the front seat I grabbed her arm to get her to stop, she didn't so I grabbed her leg still trying to get her attention for her to stop. She kept crying and I pushed on her diaper in groin area. She still wouldn't stop so I pushed on her crotch w/my finger. She [stopped] crying and was fine the rest of the way home. (It was my right hand and my finger slightly penitrated [sic] her) I did this out of frustration [and] anger to make her stop crying [hysterically].

At trial, however, appellant testified that the victim was "throwing a fit" as he was driving her back from trick-or-treating so he reached back and "popped her on the leg." Appellant stated that Detective Bassi put words in his mouth about what had happened to the victim. Appellant testified that he wrote the second statement because he "just wanted to go home."

## ISSUES

1. Was the victim's hearsay statement testimonial and therefore inadmissible under *Crawford v. Washington?*

2. Did the trial court err by admitting the victim's hearsay statement under the excited utterance exception?

3. Did the trial court err by denying appellant's request for a directed verdict?

## DISCUSSION

### 1. Testimonial vs. Nontestimonial under *Crawford v. Washington*

■ Appellant argues it was error to admit the victim's hearsay statement because pursuant to *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the hearsay statement was testimonial and therefore inadmissible because he had no prior opportunity to cross-examine the victim. We disagree.[7]

The Sixth Amendment's Confrontation Clause guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. In *Crawford v. Washington*, the United States Supreme Court (USSC) held that the admission of testimonial hearsay statements against an accused violates the Confrontation Clause if: (1) the declarant is unavailable to testify at trial, and (2) the accused has had no prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. at 54, 124 S.Ct. 1354. With regard to testimonial statements, *Crawford* overruled *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), which held that a hearsay statement is admissible if it bears adequate "indicia of reliability," i.e., it falls under a firmly rooted hearsay exception or there is an adequate showing of "particularized guarantees of trustworthiness." *See Crawford v. Washington*, 541 U.S. at 60, 124 S.Ct. 1354; *Ohio v. Roberts*, 448 U.S. at 66, 100 S.Ct. 2531.

---

7. Regarding issue preservation, we agree with appellant that although there was no contemporaneous objection during Marla's trial testimony, the hearsay issues are not procedurally barred because proper objections were made at the pretrial proceedings held just before Marla's testimony. *See State v. Forrester*, 343 S.C. 637, 642–43, 541 S.E.2d 837, 840 (2001) (where no evidence is taken between the trial court's *in limine* ruling and the admission at trial of the evidence, the issue is preserved).

The *Crawford* Court declined to comprehensively define "testimonial." It did, however, state that the "core class of 'testimonial' statements" includes:

- *ex parte* in-court testimony or its functional equivalent, such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially;
- extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions;
- statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial; and
- statements taken by police officers in the course of interrogations.

*Crawford v. Washington,* 541 U.S. at 51–52, 124 S.Ct. 1354 (citations omitted). In addition, the USSC stated that testimony "is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Id.* at 51, 124 S.Ct. 1354 (quoting 2 N. Webster, An American Dictionary of the English Language (1828)). The Crawford Court further observed that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Id.* at 51, 124 S.Ct. 1354.

Just last year, the USSC provided further guidance on the *Crawford* decision in *Davis v. Washington,* —— U.S. ——, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). There, the USSC dealt with two different domestic violence cases and held (1) a victim's identification of her abuser in response to initial questions from a 911 emergency operator was **not** testimonial, but (2) where police responded to a domestic disturbance, found the wife and husband at home, and took a statement from the wife about the husband's abuse (while the husband was in another room), the wife's statements were testimonial. The *Davis* Court explained:

Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicat-

ing that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis v. Washington,* 126 S.Ct. at 2273–74. The *Davis* Court specifically noted that its holdings related to police interrogations. *Id.* at 2274 n. 1.

Furthermore, while *Crawford* apparently left *Roberts* viable as the primary authority for analyzing nontestimonial hearsay, Davis arguably "declared that the Sixth Amendment simply has no application outside the scope of testimonial hearsay." Tom Lininger, *Reconceptualizing Confrontation After Davis,* 85 Tex. L.Rev. 271, 285 (2006); *see also U.S. v. Tolliver,* 454 F.3d 660, 665 n. 2 (7th Cir.2006) (*Davis* "appears to have resolved the issue, holding that nontestimonial hearsay is not subject to the Confrontation Clause"), *cert. denied Dunklin v. U.S.,* —— U.S. ——, 127 S.Ct. 1019, 166 L.Ed.2d 768 (2007).

The hearsay statement at issue in the instant case was made by a two-and-a-half year old girl to her caretakers immediately after they discovered blood coming from her vaginal area. The victim indicated that her "tooch" hurt, and Marla asked what happened. The victim responded by saying appellant "did it," and then quickly stating he "didn't do nothing." [8]

---

8. Other hearsay statements by the victim identifying appellant were also admitted during the State's case. When asked if the victim told him what had happened, Dr. Staples testified, without objection, as follows: "She indicated to me that she had been touched by her aunt's boyfriend that was previously identified at triage as someone named Bryan. And I asked her if the aunt's boyfriend was Bryan and she told me yes." Because the trial court's ruling dealt only with Marla's testimony, however, we restrict our analysis to this particular statement by the victim. Nonetheless, we note that since there was no objection to this part of Dr. Staples' testimony, any arguable error regarding Marla's testimony would be deemed harmless. *See State v. Mitchell,* 286 S.C. 572, 336 S.E.2d 150 (1985) (erroneous admission of hearsay evidence is subject to harmless error analysis; error is only harmless when it could not reasonably have affected the result of the trial); *State v. McFarlane,* 279 S.C. 327, 330, 306 S.E.2d 611, 613 (1983) ("It is well settled that the admission of improper evidence is harmless where it is merely cumulative to other evidence.").

We find the victim's statement to Marla is clearly nontestimonial. Significantly, the victim's statement is much more akin to a remark to an acquaintance rather than a formal statement to government officers. *See Crawford v. Washington,* 541 U.S. at 51, 124 S.Ct. 1354. Given the circumstances surrounding the victim's statement identifying appellant as the person who hurt her, as well as to whom the statement was made, the statement does not amount to "a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* Significantly, Marla's questions, as well as the victim's responses, were not designed to implicate the criminal assailant, but to ascertain the nature of the child's injury. *Cf. State v. Davis,* 371 S.C. 170, 178, 638 S.E.2d 57, 61 (2006) (generally, statements made outside of an official investigatory or judicial context are nontestimonial).

Cases in other jurisdictions with similar facts have also held the child-victim's statements to be nontestimonial. *See generally* Jerome C. Latimer, *Confrontation After Crawford: The Decision's Impact On How Hearsay Is Analyzed Under The Confrontation Clause,* 36 Seton Hall L.Rev. 327, 364–66 (2006) (statements made by children to persons unconnected to law enforcement have consistently been found to be nontestimonial). For example, in *Purvis v. State,* 829 N.E.2d 572 (Ind.Ct. App.2005), *cert. denied,* —— U.S. ——, 126 S.Ct. 1580, 164 L.Ed.2d 310 (2006), the court held that the ten-year-old victim's statements to his mother and her boyfriend immediately after the boy was molested were not testimonial. The victim, after being asked by the mother's boyfriend "what happened?" stated that the defendant had "put his 'private' into [the victim's] mouth and made [the victim] 'suck on it.'" The boy repeated similar statements to his mother soon afterward. *Id.* at 576–77.

In finding no Confrontation Clause violation under *Crawford,* the *Purvis* court explained as follows:

> The rationale of the rule in *Crawford* is to exclude from evidence statements that have not been cross-examined that were gathered for the purpose of use at a later trial. [The victim's] statements to [his mother and the man he treated as his father] were not elicited for the purpose of preparing to prosecute anyone but rather to gain information about

what happened, find out if [the victim] was harmed, and remedy any harm that had befallen him.

*Id.* at 579. The court also noted that simply because "parents turn over information about crimes to law enforcement authorities does not transform their interactions with their children into police investigations." *Id.*

In *State v. Aaron L.,* 272 Conn. 798, 865 A.2d 1135 (2005), the Connecticut Supreme Court found that a statement made by the victim when she was two-and-a-half years old was properly admitted. The child had spontaneously told her mother: " 'I'm not going to tell you that I touch daddy's pee-pee.' " *Id.* at 1145. Regarding the *Crawford* issue, the Court stated that "the victim's communication to her mother clearly does not fall within the core category of *ex parte* testimonial statements that the court was concerned with in *Crawford.*" *Id.* at 1146 n. 21.

In *Herrera–Vega v. State,* 888 So.2d 66 (Fla.Dist.Ct.App. 2004), a three-year-old girl "spontaneously told her mother, as she was putting on the child's underpants, that twenty-year-old Vega had placed his tongue in her 'private parts.' [The victim] reluctantly repeated the story to her father minutes later." *Id.* at 67. The court there held the trial court did not violate *Crawford* by allowing the parents to testify to their daughter's statements. *Id.* at 69.

In sum, the victim's hearsay statement in the instant case was not admitted in violation of *Crawford* because it is a nontestimonial statement. Accordingly, there was no Confrontation Clause violation.

### 2. Excited Utterance

█ Appellant also argues the victim's statement was improperly admitted under the excited utterance hearsay exception. Appellant's arguments on this issue are twofold. First, appellant contends the statement does not qualify as an excited utterance. Specifically, appellant argues the victim was no longer under the influence of the startling event as evidenced by her singing karaoke songs and eating candy after she returned to Marla's home. Second, appellant contends that because the victim was declared incompetent to testify at trial,

her hearsay statement made over one year prior to trial is similarly unreliable. We disagree.

" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 801(c), SCRE. The general rule is that hearsay is not admissible. Rule 802, SCRE. There are, however, numerous exceptions to this rule, such as the excited utterance exception. The rules of evidence define excited utterance as a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Rule 803(2), SCRE.

▪ An excited utterance may be admitted whether or not the declarant is available as a witness. *See* Rule 803, SCRE (entitled "Hearsay Exceptions; Availability of Declarant Immaterial"). Moreover, when a statement is admissible because it falls within a Rule 803 exception, it may be used substantively, that is, to prove the truth of the matter asserted. *State v. Dennis*, 337 S.C. 275, 283–84, 523 S.E.2d 173, 177 (1999). Consequently, in the instant case, if the victim's statement qualifies as an excited utterance, the State properly admitted it to prove that appellant committed the assault.

▪ Looking at the rule, there are three elements that must be met to find a statement to be an excited utterance: (1) the statement must relate to a startling event or condition; (2) the statement must have been made while the declarant was under the stress of excitement; and (3) the stress of excitement must be caused by the startling event or condition. *State v. Sims*, 348 S.C. 16, 21, 558 S.E.2d 518, 521 (2002). The excited utterance exception is based on the rationale that "the startling event suspends the declarant's process of reflective thought, reducing the likelihood of fabrication." *State v. Dennis*, 337 S.C. at 284, 523 S.E.2d at 177. A court must consider the totality of the circumstances when determining whether a statement falls within the excited utterance exception, and that determination is left to the sound discretion of the trial court. *Sims, supra.*

In our opinion, the trial court did not abuse its discretion by admitting the victim's statement as an excited utterance. Clearly, the statement related to the startling event of the

victim being severely injured in her vaginal area. The victim was complaining of pain and was bleeding when the statements were made, and thus, the victim made the declaration while under the stress of her attack. Finally, this stress obviously was caused by the startling event of the sexual assault itself. The requirements of Rule 803(2), SCRE, were easily satisfied in this case. *See also Purvis v. State,* 829 N.E.2d at 581 (where the court found the victim's statement to his father figure, made almost immediately after being molested, and while the boy was "plainly upset," clearly "met all the criteria" for excited utterances).

■ We turn now to appellant's claim that because the victim was declared incompetent to testify, her excited utterance was inherently unreliable and therefore was erroneously admitted. This is a novel issue in South Carolina.[9]

The majority of courts that have encountered this issue have held that even though a child could be declared incompetent to testify at trial, the child's "spontaneous declarations or *res gestae* statements" are nonetheless admissible. *See* Jay M. Zitter, Annotation, *Admissibility of Testimony Regarding Spontaneous Declarations Made by One Incompetent to Testify at Trial,* 15 A.L.R.4th 1043 (1982); *see also* 2 McCORMICK ON EVIDENCE § 272 (6th ed.2006) ("an excited utterance is admissible despite the fact that the declarant was a child and would have been incompetent as a witness for that reason"); 2 Wharton's Criminal Evidence § 7:1 (15th ed.1998) (noting that courts have admitted out-of-court statements by children found incompetent to testify).

In *Morgan v. Foretich,* 846 F.2d 941 (4th Cir.1988), the Fourth Circuit dealt with this issue in a civil case for damages arising out of child sexual abuse. Before proceeding to the

---

9. In *Sims,* there was a somewhat similar factual scenario; however, this precise legal issue was not raised. There, a five-year-old boy witnessed a brutal attack on his mother, who later died. At trial, the boy was declared competent to testify, but while on the stand, he stopped answering questions and would not tell the jury the identity of the person who was in the apartment on the night his mother was attacked. The responding police officer was recalled to the stand and testified that the boy had identified the defendant. The trial court subsequently ruled the statement was admissible hearsay. *Sims,* 348 S.C. at 20, 558 S.E.2d at 520. This Court affirmed, finding the boy's statement was an excited utterance.

legal analysis of the evidentiary issues, the *Morgan* court noted generally the following:

> An estimated one in five females suffers from sexual abuse as a child.... [I]n two-thirds of child abuse cases, the incident is never even reported.... Even when the incident is reported, prosecution is difficult and convictions are few. Much of this difficulty stems from the fact that methods of proof in child abuse cases are severely lacking. Often, the child is the only witness. Yet age may make the child incompetent to testify in court, and fear, especially when the perpetrator is a family member, may make the child unwilling or unable to testify.

*Id.* at 943 (footnotes and citations omitted).[10] After thoroughly analyzing the hearsay issue, the court decided that four of the victim's statements made to her mother when the victim was two and three years old should have been admitted as excited utterances; significantly, the court also found that the victim's "youthful incompetency" would not prevent the admission of the hearsay statements. *Id.* at 946–48.

The Washington Court of Appeals faced this exact issue in a case with facts strikingly similar to the case at bar. *See State v. Bouchard*, 31 Wash.App. 381, 639 P.2d 761 (1982). In *Bouchard*, the defendant's conviction for indecent liberties with his three-year-old granddaughter was affirmed; the victim had suffered a perforated hymen which the State asserted was the result of the grandfather's digital penetration of the victim. *Id.* at 762. The hearsay evidence was described by the court as follows:

> The little girl's mother testified that when her daughter returned home she complained of "water" in her pants. When the mother changed the child's clothing, she found blood around her daughter's lower abdominal and vaginal areas. When questioned about the blood, the child told her mother, "Grandpa did it." The father and attending physi-

---

**10.** *See generally* Robert G. Marks, Note, *Should We Believe The People Who Believe The Children?: The Need For A New Sexual Abuse Tender Years Hearsay Exception Statute*, 32 Harv. J. on Legis. 207, 207, 214 (1995) (where the author observes that the "sexual abuse of children is one of America's most terrifying social problems" and child sexual abuse "is an extremely difficult crime to prosecute").

cians testified that the child made similar statements to them.

*Id.* at 763. The *Bouchard* court rejected the defendant's arguments that the statements were inadmissible hearsay and the victim's incompetency should have prevented the admission of the statements. The court held the victim's statements fell within the excited utterance exception to the hearsay rule and specifically stated "[t]he fact that the declarant herself (an infant) would not be competent to testify does not prohibit the use of the excited utterances." *Id.*

We hold that the incompetency of a declarant at the time of trial does not preclude the admission of that declarant's excited utterance through a different, competent witness. *See, e.g., State v. Bauer,* 146 Ariz. 134, 704 P.2d 264, 267 (1985) ("excited utterances of children who are incompetent to testify because of their age are admissible in evidence"); *Kilgore v. State,* 177 Ga.App. 656, 340 S.E.2d 640, 643 (1986) (rejecting the contention "that because the victim would have been incompetent to testify in court, her out-of-court statements were thus unreliable and incompetent"); *People v. Smith,* 152 Ill.2d 229, 178 Ill.Dec. 335, 604 N.E.2d 858, 871 (1992) (excited utterances are sufficiently reliable to be admitted even where the declarant is incompetent); *Com. v. Pronkoskie,* 477 Pa. 132, 383 A.2d 858, 861 n. 5 (1978) ("a finding of incompetency to testify does not necessarily undermine the indicia of reliability attendant upon an excited utterance of the incompetent witness"); *Bouchard, supra.*

The legal rationales underlying the rules about both competency and the excited utterance hearsay exception make plain that one ruling has little to do with the other. The competency of a witness depends solely on the facts as they exist when the testimony is given. 81 AM.JUR.2D *Witnesses* § 160 (2004).[11] Conversely, the intrinsic reliability of an excited utterance derives from the statement's spontaneity which is determined

---

11. Under South Carolina law, a person will be found incompetent as a witness "if the court determines that (1) the proposed witness is incapable of expressing himself concerning the matter as to be understood by the judge and jury either directly or through interpretation by one who can understand him, or (2) the proposed witness is incapable of understanding the duty of a witness to tell the truth." Rule 601(b), SCRE.

by the totality of the circumstances surrounding the statement when it was uttered. *Sims, supra.* This reliability "will normally remain undiluted by faulty memory, inability to understand questions or otherwise to communicate on the witness stand." *Pronkoskie,* 383 A.2d at 861 n. 5. In other words, the trustworthiness of the excited utterance "stems not from [the declarant's] competency, but rather from the unique circumstances in which [the] statements were made." *People v. Smith,* 178 Ill.Dec. 335, 604 N.E.2d at 871. Thus, the fact that a declarant is not able to testify at trial does not diminish the reliability of that declarant's excited utterance. Because the reliability of the excited utterance is unaffected by the incompetency determination, but rather is independently evaluated under long-standing rules developed from the common law, we find appellant's argument that the victim's incompetency at the time of trial should disqualify the admission of her excited utterance untenable.

Accordingly, in the instant case, it was well within the trial court discretion to admit the victim's statements under the excited utterance exception to the hearsay rule.

### 3. Directed Verdict

⬛ Finally, appellant argues the trial court erred by denying his directed verdict motion because the evidence only raised a suspicion that he was guilty. We disagree.

⬛ On a directed verdict motion in a criminal case, the trial court is concerned with the existence or non-existence of evidence, not its weight. *E.g., State v. Burdette,* 335 S.C. 34, 46, 515 S.E.2d 525, 531 (1999). If the State presents any evidence which reasonably tends to prove the defendant's guilt, or from which the defendant's guilt could fairly and logically be deduced, the case must go to the jury. *Id.* A defendant is only entitled to a directed verdict when the State fails to put up evidence of the offense charged. *State v. McHoney,* 344 S.C. 85, 97, 544 S.E.2d 30, 36 (2001). On appeal from the denial of a directed verdict motion, this Court must view the evidence in a light most favorable to the State. *Burdette, supra.*

We find the trial court correctly denied the directed verdict motion in this case. Viewing the evidence in a light most

favorable to the State, including the testimony which places appellant with the victim at the most likely time the injury was inflicted, the victim's identification of appellant as the perpetrator, as well as appellant's inculpatory statements, it is clear that the case was properly submitted to the jury. To the extent appellant is arguing that the State's case was based on unreliable evidence, the trial court is only concerned with the existence of the evidence, not its weight, when deciding a directed verdict motion. *McHoney, supra; Burdette, supra.*

## CONCLUSION

For all the above reasons, appellant's conviction is **AF-FIRMED.**

TOAL, C.J., MOORE, BURNETT and PLEICONES, JJ., concur.