# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

John Calvin Sledge, Appellant.

Appellate Case No. 2016-000641

---

Appeal From Greenville County
D. Garrison Hill, Circuit Court Judge

---

Opinion No. 5672
Heard October 1, 2018 – Filed August 7, 2019

---

## AFFIRMED IN PART AND VACATED IN PART

---

Laura Ruth Baer, of Collins & Lacy, PC, of Columbia,
for Appellant.

Attorney General Alan McCrory Wilson, Deputy
Attorney General Donald J. Zelenka, Senior Assistant
Deputy Attorney General Melody Jane Brown, and
Assistant Attorney General Caroline M. Scrantom, all of
Columbia; and Solicitor William Walter Wilkins, III, of
Greenville, for Respondent.

---

**HUFF, J.:** John Calvin Sledge appeals from his convictions and sentences for murder, unlawful conduct toward a child, and possession of a weapon during the commission of a violent crime. On appeal, Sledge raises three issues: (1) whether the trial court erred in admitting portions of a 911 call because they amounted to inadmissible hearsay and were more prejudicial than probative; (2) whether the

trial court erred in admitting his statements to police because they were not freely and voluntarily given; and (3) whether the trial court erred in imposing a five-year sentence for possession of a weapon during the commission of a violent crime because he was given a life sentence for the murder charge and section 16-23-490 of the South Carolina Code expressly prohibits such. We affirm the convictions but vacate the sentence imposed for the weapon possession.

## FACTUAL/PROCEDURAL BACKGROUND

On the night of January 29, 2014, Kimberly Sledge (Victim) was killed by a single gunshot to the back of her head. After receiving two hang-up calls at 10:15 and 10:16 p.m. that night, 911 communications received a third call from Victim's ten-year-old son, M.W., at 10:17 p.m. In the 911 call, M.W. reported that his mother had been shot and stated that his mother was married to John Sledge. When the dispatcher asked who shot Victim, M.W. replied, "John Sledge." Asked when this occurred, M.W. replied, "Just a minute ago." M.W. told the dispatcher he thought his "dad just ran off." The dispatcher asked M.W. if Victim and Sledge were arguing, and M.W. stated that they were. M.W. provided a description of Sledge's vehicle to the dispatcher. The young boy can be heard crying often and expressing shock, disbelief, and fear during the twenty-two-minute call.

Officers arrived at the incident location at 10:34 p.m. Once in the home, they found M.W. on the phone in the living room and Victim deceased in the bathroom. After a "be on the lookout" was dispatched for Sledge, Deputies Robert May and John Williams observed a car matching the description of Sledge's and activated their blue lights and stopped Sledge. Because they were responding to an incident involving a gunshot victim, the deputies drew their firearms and ordered Sledge to show his hands and get out of his car and on the ground. Deputy May acknowledged repeatedly using profane language with Sledge while instructing Sledge to put his hands out the window of his car. The deputies placed Sledge in handcuffs and escorted him to Deputy May's vehicle, placing him inside it. Though Deputy May was holding on to Sledge, he testified Sledge was "able to walk just fine." Deputy May then read Sledge his *Miranda*[1] rights. Deputy May testified Sledge appeared to be intoxicated, and he noted Sledge had a strong odor of alcoholic beverage coming from his person.[2] However, he testified Sledge was

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).
[2] Deputy Williams found a 12-pack of beer in the passenger seat of Sledge's truck and noticed a few beers were missing.

not "fall-down drunk," and he appeared to understand what was being said and was able to carry on a conversation. Review of Deputy May's in-car video reveals very clear *Miranda* warnings were given and Sledge responded "Yes, sir" when asked if he understood his rights. Further, Sledge appeared to get on the ground without difficulty when instructed to do so, and he did not stumble or falter when walking to the deputy's car. When asked if he would like to speak to the deputies, Sledge said he would and asked "what's going on?" Deputy May informed Sledge he was being detained because there was a crime scene at his house. Sledge asked the deputy "why" and indicated he did not know why there would be a crime scene. Deputy May then asked Sledge what he was doing before he left the house, and Sledge described some of his activities and indicated he left the house after getting into an argument with his wife. During the drive, Sledge questioned what was happening and Deputy May responded, "Well you and your wife got in a fight, right?" Sledge asked what was wrong with his wife and what was wrong with his family. The deputy responded he was going to let someone else tell Sledge about it, but told him that his child was fine.

While Deputy May was transporting Sledge to the Law Enforcement Center (LEC), the deputy was instructed to stop and meet with a forensic officer. Deputy May stopped at a business where the forensic technician, Iona Ooten, swabbed Sledge's hands for gunshot residue. Review of the in-car video reveals as follows: During this time—at around forty-nine minutes into the video—Sledge asked to use the bathroom, but the officers told him it was too cold. Deputy May buckled Sledge back in the vehicle, and Sledge again asked to use the bathroom. Ooten again stated that it was too cold, and Deputy May told Sledge he could use the bathroom downtown once they arrived there. About a minute after he first asked, Sledge asked to use the bathroom a third time and received the same response. They arrived at the LEC at about one hour and eighteen minutes into the video, or twenty-nine minutes after Sledged first requested to use the bathroom.

Once at the LEC, Sledge encountered Sergeant Ramon Rivera before being brought into an interview room, at which time Sledge asked if he could use the restroom. Sergeant Rivera was in the process of obtaining search warrants related to the matter at that time and told Sledge he would be back in five minutes. When Sergeant Rivera returned and asked Sledge if he still needed to use the restroom, Sledge stated he did not. Before Sledge was interviewed, a search warrant was served on him. While Sergeant Rivera stepped away to retrieve something, Sledge was escorted into the interview room where the search warrant was served on him, and he was stripped naked, processed for DNA, and photographed by Ooten. When Sergeant Rivera returned a few minutes later he was informed Sledge may

have urinated on himself, and he noticed the chair Sledge had been sitting in was wet, and there was something wet on the floor. Sergeant Rivera and Investigator Tracy King then interviewed Sledge for two and a half hours after Sledge waived his *Miranda* rights. In the interview room, Sergeant Rivera asked Sledge whether he had been drinking. Sledge stated he had. The sergeant then asked Sledge if he was under the influence of alcohol, and Sledge replied that he was not, stating he drank two beers three or four hours ago. During the interview, Sledge claimed he and Victim only bickered that night and did not fight. He denied that he left the home after shooting his gun, denied knowing what happened to Victim, denied M.W. came out of the room during their bickering to see him sitting or lying on top of Victim as described by M.W., and adamantly denied shooting or harming Victim that night.

Meanwhile, Sergeant Ragan Marling, who at that time worked in criminal investigation involving crimes against children, met with M.W. at her office. She testified M.W. was visibly upset, asking a lot of questions concerning Victim. When Sergeant Marling informed him that his mother did not survive, M.W. broke down, started crying, and kept asking over and over, "Why would he do this?" On cross-examination, the defense elicited the following from Sergeant Marling: M.W. told her he heard arguing and yelling throughout the day; M.W. went into the den to see what was happening; he said Victim's shoulder appeared to be injured; at one time when he came out of his room, Victim and Sledge were in a physical altercation—with Sledge on top of Victim on the floor in front of the fireplace—and M.W. tried unsuccessfully to push Sledge off of Victim; M.W. then went back into his bedroom; before entering his bedroom, he stood at the doorway to his bedroom talking to Victim, who was in the bathroom near his bedroom, and Sledge stated something about taking Victim to the hospital; M.W. turned around and went into his bedroom and, thereafter, heard a loud bang; when he came out of his bedroom about ten minutes after hearing the bang, he did not see Sledge in the house. Notably, defense counsel asked the sergeant if M.W. went to bed after he tried to push Sledge off Victim, and she stated M.W. went back to his room at that time, but she did not believe he went to bed at that time.

M.W. testified at trial concerning the events of that day. He stated they did not have any visitors. He ate dinner in his room that evening and spent most of his time in his bedroom once he came back into the house. At some point, Victim entered M.W.'s room trying to get away from Sledge. Before Victim entered his room, M.W. heard Victim and Sledge arguing. Victim left M.W.'s room and, thereafter, M.W. went out of his room to check on Victim because Victim and Sledge were being loud and M.W. was trying to go to sleep. When he exited his

room, he saw Sledge sitting on Victim in a squatting position as Victim was on her back. M.W. pushed Sledge off Victim and Victim told M.W. to "just go," so M.W. went to his room. Victim followed M.W. back into his room. M.W. thought Victim had a broken collarbone, and he asked her about her shoulder. Victim stated to M.W. that Sledge was really mad and might kill her, which scared M.W. Victim then left M.W.'s room. M.W. estimated the time of this incident was 8:30 or 9:00 because that was his normal bedtime, he was in his pajamas, and he was "trying to go to sleep." He was not able to relax, though, as he heard arguing while he was in his bedroom. M.W. did not emerge from his room again until after he heard a loud bang and he felt the house shake and smelled gun smoke. M.W. waited about five minutes before he came out of his room. He found his mother face down on the floor between the hall and the bathroom, and Sledge was no longer there. M.W. found a phone in the bathroom and called 911.

Law enforcement did not find evidence of a robbery or burglary. Additionally, the evidence did not support that the crime involved a home invasion. Investigation into the lives of Victim and Sledge did not reveal any other individuals who had a problem with either of them. After the 10:15 and 10:16 p.m. hang-up calls, the third 911 call from M.W. started at 10:17 p.m. Review of surveillance video from a convenience store—identified by Sledge as the place he had driven to that night to purchase beer after he left his home—showed Sledge was at the location at 10:27 p.m. The drive from Sledge's house to the store took approximately nine minutes. One of the investigators testified he found a fairly large quantity of long, blond hair consistent with Victim's in the bathroom but found no hairbrushes in the room, which indicated some type of altercation occurred there. Victim sustained a single gunshot to the back of her head, which would have resulted in a very quick demise. The cause of death was determined to be a gunshot wound to the head, and the manner of death was ruled a homicide.

After the matter was submitted to the jury, it found Sledge guilty of murder, possession of a weapon during the commission of a violent crime, and unlawful conduct toward a child. The trial court sentenced Sledge to life on the murder charge, five years for possession of a weapon during the commission of a violent crime, and ten years for unlawful conduct toward a child.

## STANDARD OF REVIEW

In criminal cases, this court sits to review errors of law only and is bound by the trial court's factual findings unless those findings are clearly erroneous. *State v. Baccus*, 367 S.C. 41, 48, 625 S.E.2d 216, 220 (2006). The admission or exclusion

of evidence is within the discretion of the trial court, and its decision will not be disturbed on appeal absent an abuse of discretion. *State v. Winkler*, 388 S.C. 574, 583, 698 S.E.2d 596, 601 (2010). An abuse of discretion occurs when the trial court's conclusions either lack evidentiary support or they are controlled by an error of law. *Id.* "Our role when reviewing a trial court's ruling concerning the admissibility of a statement upon proof of its voluntariness is not to reevaluate the facts based on our view of the preponderance of the evidence." *State v. Breeze*, 379 S.C. 538, 543, 665 S.E.2d 247, 250 (Ct. App. 2008). "Rather, our standard of review is limited to determining whether the trial court's ruling is supported by any evidence." *Id.* "Thus, on appeal the trial court's findings as to the voluntariness of a statement will not be reversed unless they are so erroneous as to show an abuse of discretion." *Id.*

## LAW/ANALYSIS

### I.     911 Call

Sledge made a pre-trial motion to exclude portions of M.W.'s 911 call. The trial court ruled the evidence admissible and allowed the tape to be played for the jury over Sledge's objection. On appeal, Sledge contends the trial court erred in admitting the portions of the 911 call in which M.W. stated (1) Victim and Sledge were fighting earlier in the evening and (2) Sledge shot Victim. He argues the statements were inadmissible hearsay for which no exception applies, and they were more prejudicial than probative. We disagree.

Rule 803 of our evidentiary rules affords an excited utterance exception to the rule against hearsay. It provides, even though the declarant is available as a witness, "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is not excluded by the hearsay rule. Rule 803(2), SCRE.

> Three elements must be met for a statement to be an excited utterance: (1) the statement must relate to a startling event or condition; (2) the statement must have been made while the declarant was under the stress of excitement; and (3) the stress of excitement must be caused by the startling event or condition.

*State v. Stahlnecker*, 386 S.C. 609, 623, 690 S.E.2d 565, 573 (2010). "In determining whether a statement falls within the excited utterance exception, a

court must consider the totality of the circumstances." *State v. Sims*, 348 S.C. 16, 20, 558 S.E.2d 518, 521 (2002). "Additionally, such a determination is left to the sound discretion of the trial court." *Id.* at 21, 558 S.E.2d at 521. "The passage of time between the startling event and the statement is one factor to consider, but it is not the dispositive factor." *Stahlnecker*, 386 S.C. at 623, 690 S.E.2d at 573. "Other factors useful in determining whether a statement qualifies as an excited utterance include the declarant's demeanor, the declarant's age, and the severity of the startling event." *Id.* (quoting *Sims*, 348 S.C. at 22, 558 S.E.2d at 521). "The excited utterance exception is based on the rationale that 'the startling event suspends the declarant's process of reflective thought, reducing the likelihood of fabrication.'" *State v. Ladner*, 373 S.C. 103, 116, 644 S.E.2d 684, 691 (2007) (quoting *State v. Dennis*, 337 S.C. 275, 284, 523 S.E.2d 173, 177 (1999)). The determination of whether a statement qualifies as an excited utterance exception "is left to the sound discretion of the trial court." *Sims*, 348 S.C. at 21, 558 S.E.2d at 521. The burden of establishing facts that would qualify a statement as an excited utterance is upon the proponent of the evidence. *State v. Davis*, 371 S.C. 170, 178-79, 638 S.E.2d 57, 62 (2006).

Sledge cites *Davis* in support of his argument that, because M.W. did not witness the shooting, the excited utterance exception does not apply. We find *Davis* distinguishable and the *Sims* case more applicable to the excited utterance exception under the facts of this case.

*Davis* involved the admissibility of testimony from the State's key witness, Shawn Hicks, regarding statements made to him by Greg Hill. 371 S.C. at 173, 638 S.E.2d at 59. Hicks testified he heard Davis, Reggie Stevens, and the victim arguing, after which he heard a gunshot and saw three individuals running through the victim's backyard. *Id.* After hearing the gunshot, Hicks sold drugs to Stevens and Hill, and Stevens and Hill returned a short time later with Davis. Davis then bought drugs from Hicks, during which time Davis had a shotgun. *Id.* Hicks testified Davis offered to sell him the shotgun. *Id.* Over defense counsel's objection, Hicks testified Hill told him not to purchase the gun. *Id.* at 174, 638 S.E.2d at 59. Thereafter, Hicks testified Hill told him that Davis and Stevens went into the house and further advised Hicks not to get the shotgun because the victim had been shot with it. *Id.*

This court affirmed Davis' murder and armed robbery convictions, and Davis filed a petition for writ of certiorari, arguing the statement made by Hill to Hicks—that the shotgun had been used to murder the victim—was erroneously admitted hearsay. *Id.* at 177, 638 S.E.2d at 61. Our supreme court agreed with Davis,

finding this court erred in determining Hill's statement was admissible under the excited utterance exception. *Id.* at 178, 638 S.E.2d at 61-62. The court noted, "statements which are not based on firsthand information, such as [when] the declarant was not an actual witness to the event, are not admissible under the excited utterance exception to the hearsay rule." *Id.* at 179, 638 S.E.2d at 62. It concluded there was insufficient evidence that Hill's statement was an excited utterance because (1) no evidence was elicited by the State that Hill was still under the stress or excitement of the victim's shooting when the alleged statement was made and, therefore, the State failed to meet its burden of establishing a foundation for the excited utterance and (2) there was no evidence in the record to support the conclusion that Hill witnessed the shooting. *Id.* at 180, 638 S.E.2d at 62-63.

In *Sims*, police were dispatched to a location one morning where a five-year-old boy had been found upset and crying outside the apartment of his mother. 348 S.C. at 18, 558 S.E.2d at 520. The child's mother—the victim—was found inside the apartment in a pool of blood, and she remained in a coma until her death. *Id.* at 18-19, 558 S.E.2d at 520. At trial, the child, who was then six years old, initially answered the solicitor's questions and stated someone else was in the home besides him and his mother and he saw his mother getting hurt. *Id.* at 19, 558 S.E.2d at 520. However, the child would not identify the person who was in the apartment that night. *Id.* Thereafter, the solicitor elicited testimony from the responding officer that the child appeared withdrawn and answered questions vaguely while keeping his head down. *Id.* at 20, 558 S.E.2d at 520. Over defense counsel's hearsay objection, the officer testified the child had indicated the appellant was in the apartment the night of his mother's death. *Id.* The trial court found the statement was hearsay but ruled it was admissible under the circumstances, noting the age of the child and the fact the child made the statement after he discovered his mother under traumatic circumstances. *Id.*

Our supreme court found the trial court did not abuse its discretion in admitting the child's statement to the officer because it fell under the excited utterance exception to the hearsay rule. *Id.* at 23, 558 S.E.2d at 522. In so ruling, the court found it met the first element required for an excited utterance exception because the statement related to the startling event of the child "seeing his mother after she was attacked and possibly while she was being attacked." *Id.* at 21, 558 S.E.2d at 521. It further found, if the child was under the stress of excitement—the second element—"then that stress was caused by the startling event of seeing his mother being attacked and not being able to wake her." *Id.* The court ultimately determined the child was under the stress of the excitement. *Id.* at 21-23, 558 S.E.2d at 521-22. It acknowledged a possible time period of twelve hours between

the time of the attack and the time of the child's statement but observed, "[e]ven statements after extended periods of time can be considered an excited utterance as long as they were made under continuing stress." *Id.* at 21-22, 558 S.E.2d at 521. It further noted:

> In this case, a five-year-old child possibly saw his mother being attacked and, at the very least, was left alone with his severely injured mother whom he could not wake, until he made his way outside to be found by a neighbor. Under these circumstances, we find the stress of excitement from those events lasts a longer period of time than would be likely to occur if the son had been an adult.

*Id.* at 22, 558 S.E.2d at 521. Finding the declarant's demeanor and age and the severity of the startling event are other factors useful in determining whether a statement qualifies as an excited utterance—and the child's age and the severity of the startling event clearly weighed in favor of finding his statement to be an excited utterance—the court then looked at the child's demeanor. *Id.* It concluded, although the child "was not crying or acting 'excited' in the sense of being animated when he made the statement," his demeanor could be characterized as someone who was under the "stress of excitement." *Id.* at 22, 558 S.E.2d at 522. Accordingly, it held "[g]iven the totality of the circumstances, we find the [child] was under the continuing stress of excitement when he told [the officer] appellant was in the home the night of the attack." *Id.* at 23, 558 S.E.2d at 522.

Like *Sims*, we find the trial court did not abuse its discretion in admitting M.W.'s statements to the officer concerning who shot Victim and that Victim and Sledge had been arguing because these statements fall under the excited utterance exception to the hearsay rule. *See Stahlnecker*, 386 S.C. at 623, 690 S.E.2d at 573 ("Three elements must be met for a statement to be an excited utterance: (1) the statement must relate to a startling event or condition; (2) the statement must have been made while the declarant was under the stress of excitement; and (3) the stress of excitement must be caused by the startling event or condition."). First, M.W.'s statements that Sledge shot his mother and that Sledge and his mother had been arguing undoubtedly relate to a startling event. Second, the statements were made while M.W. was under the continuing stress of the excitement. M.W. testified only about five minutes passed after he heard the gunshot before he emerged from his room to find Victim and call 911. Additionally, though there is an indication that at least some of the arguing was more removed in time, we

nonetheless find M.W. was under continuing stress despite the lapse in time. *See Sims*, 348 S.C. at 21-22, 558 S.E.2d at 521 ("While the passage of time between the startling event and the statement is one factor to consider, it is not the dispositive factor. Even statements after extended periods of time can be considered an excited utterance as long as they were made under continuing stress."). Although the 911 recording reflects M.W. tried to remain calm and assist the dispatcher in providing important information during the call, M.W. can be heard crying at times, and he expressed shock, disbelief, and fear during the twenty-two-minute call. Third, it is clear the stress of the excitement was caused by the startling event. Notably, M.W.'s demeanor, his age, and the severity of the startling event also weigh in favor of finding the statements complained of were excited utterances. *See id.*at 22, 558 S.E.2d at 521 ("Other factors useful in determining whether a statement qualifies as an excited utterance include the declarant's demeanor, the declarant's age, and the severity of the startling event."). Accordingly, we find the statements were properly admitted under the excited utterance exception.[3]

We acknowledge that *Davis* clearly provides that in situations in which the declarant does not have firsthand knowledge because he did not witness an event, statements made by the declarant concerning the event are not admissible under the excited utterance exception to the rule against hearsay. Nonetheless, we find this situation is distinguishable from *Davis* because, while the evidence suggests M.W. did not visually observe Sledge shoot Victim, he perceived Sledge shot her based upon his witnessing of the argument and physical altercation between Sledge and Victim prior to the shooting, his auditory and sensory perception of the shooting, and his discovery of Victim's body in a pool of blood and the fact that Sledge had left the house. Under the totality of the circumstances, in particular the sequence of events here, we find the startling event was such as to suspend M.W.'s process of reflective thought, thereby reducing the likelihood he fabricated the statements in issue. *See Ladner*, 373 S.C. at 116, 644 S.E.2d at 691 ("The excited utterance exception is based on the rationale that 'the startling event suspends the declarant's

---

[3] Based upon this determination, we need not reach Sledge's argument that the statements were also not admissible under the present sense impression exception to the rule against hearsay. *See* Rule 803(1), SCRE ("The following are not excluded by the hearsay rule, even though the declarant is available as a witness: . . . (1) Present Sense Impression. A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter.").

process of reflective thought, reducing the likelihood of fabrication.'" (quoting *Dennis*, 337 S.C. at 284, 523 S.E.2d at 177)).

We also disagree with Sledge's assertion the statements should have been excluded because they were more prejudicial than probative. All relevant evidence is generally admissible. Rule 402, SCRE. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, SCRE. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Rule 403, SCRE. "Unfair prejudice means an undue tendency to suggest decision on an improper basis." *State v. Wiles*, 383 S.C. 151, 158, 679 S.E.2d 172, 176 (2009). Rule 403, SCRE, has sometimes been misstated, incorrectly providing that for evidence to be admissible under a Rule 403 analysis the probative value of evidence must substantially outweigh the danger of unfair prejudice to the defendant, whereas "[t]he correct test is the opposite: whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice." *State v. King*, 424 S.C. 188, 200 n.6, 818 S.E.2d 204, 210 n.6 (2018). The misstated test "incorrectly places the burden on the proponent of the evidence to establish admissibility, while the proper test places the burden on the opponent of the evidence to establish inadmissibility" under Rule 403. *Id.* An appellate court reviews a trial court's Rule 403, SCRE ruling pursuant to an abuse of discretion standard and gives great deference to the trial court's determination. *State v. Collins*, 409 S.C. 524, 534, 763 S.E.2d 22, 28 (2014). "A trial [court's] decision regarding the comparative probative value and prejudicial effect of evidence should be reversed only in exceptional circumstances." *Id.* (quoting *State v. Adams*, 354 S.C. 361, 378, 580 S.E.2d 785, 794 (Ct. App. 2003)).

Here, the statements at issue were clearly relevant as to motive, opportunity and identity. Further, while we acknowledge the prejudicial effect is great—particularly as to M.W.'s statement that Sledge shot his mother—the child's trial testimony provides additional damaging details not included in the 911 call, including that he witnessed a physical altercation between Sledge and Victim prior to the shooting and, during this time, Victim told M.W. that Sledge was really mad at her and might kill her. His trial testimony also established a scenario that explains why M.W. would have perceived Sledge was the person who shot his mother. Accordingly, we cannot say the probative value of the evidence was substantially outweighed by the danger of unfair prejudice, and we find no abuse

of discretion in the trial court's determination the evidence was admissible under Rule 403.

## II.     Statements to Police

Sledge contends the trial court erred in admitting both his statements in the patrol car and those made during the interrogation at the LEC because, based on the totality of the circumstances, they were not freely and voluntarily made. He maintains the trial court's ruling reveals it looked at the facts and circumstances in a piecemeal fashion rather than focusing on the totality of the circumstances. He points to the following: the long duration of police custody prior to his arrest; the circumstances surrounding him being pulled over with the officers' guns drawn, them yelling obscenities, and him being handcuffed on the pavement despite his compliance; the fact that he was intoxicated; Sledge's repeated requests for an explanation; the fact that he was driven to a parking lot where his hands were swabbed for gunshot residue and he requested to use the bathroom and was assured he would be given the opportunity when they reached the LEC; the fact that he remained handcuffed at the LEC and he was not given access to a bathroom in spite of another request; the fact that he was stripped naked in the presence of several officers—including a female officer who photographed him; and the fact that he was in an orange jumpsuit and was handcuffed to a belt, where he remained until 4:14 a.m. Sledge argues, while none of these facts alone undermined the voluntariness of his statements, they had the cumulative effect of rendering his waiver involuntary. Accordingly, he contends the State failed to meet its burden of proving either of his waivers of rights were voluntary. We disagree.

First, we agree with the State that the issue concerning admission of the LEC interview recording is not preserved for our review. Defense counsel made a pretrial motion to exclude his statements made during the interview and again sought exclusion of the entire recording during the trial. However, following redaction of the recording, and after presentation of testimony from a witness on an unrelated matter, defense counsel stated he had no objection to admission of the redacted recording. *See State v. Wannamaker*, 346 S.C. 495, 499, 552 S.E.2d 284, 286 (2001) (holding appellant's assertion that the trial court erred by refusing to suppress a custodial statement was unpreserved because trial counsel failed to make a contemporaneous objection to the statement being read into evidence); *State v. Dicapua*, 373 S.C. 452, 455, 646 S.E.2d 150, 152 (Ct. App. 2007) (holding the defendant's statement that he had no objection to a videotape coming into evidence "amounted to a waiver of any issue" the defendant had with the videotape); *Burke v. AnMed Health*, 393 S.C. 48, 55, 710 S.E.2d 84, 88 (Ct. App.

2011) ("When a party states to the trial court that it has no objection to the introduction of evidence, even though the party previously made a motion to exclude the evidence, the issue raised in the previous motion is not preserved for appellate review."). Nonetheless, even if the issue were properly preserved, we find no error in the admission of either the statements made in the patrol car or those made during the interrogation at the LEC.

In the video from Deputy May's car, when Sledge was initially pulled over he immediately complied with the officers' instructions, appeared to get on the ground without difficulty, and he did not stumble or falter when walking to the deputy's car. Thereafter, a very clear *Miranda* warning was given, and Sledge responded "Yes, sir" when asked if he understood his rights. Though the officers were unable to accommodate Sledge's request to use the bathroom while in the parking lot, nothing of substance to this case was discussed by Sledge until arrival at the LEC. Once at the LEC, Sledge again asked to use the bathroom, and Sergeant Rivera told him he would be back in five minutes. When Sergeant Rivera returned and asked Sledge if he still needed to use the restroom, Sledge stated he did not. While Sergeant Rivera went to retrieve something, Sledge was escorted into the interview room for processing. When Sergeant Rivera returned, he was informed Sledge may have urinated on himself. Sergeant Rivera testified he was gone for just a few minutes during this time. Sledge changed into a jumpsuit before the interview began at the LEC. During the LEC interview, the recording shows a thorough recitation and explanation of Sledge's rights. Sledge was alert, coherent and attentive, and he requested an explanation when he desired. He stated he understood his rights and wished to speak to the officers. Sledge initialed each of the rights read to him and signed below the Waiver of Rights language emphatically stating, "I have nothing to hide, sir."

Though Deputy May testified Sledge appeared intoxicated when he pulled him over, and Sledge stated in his LEC interview he had two beers to drink, we find nothing to indicate intoxication to the level that Sledge did not realize what he was saying. *See State v. Saxon*, 261 S.C. 523, 529, 201 S.E.2d 114, 117 (1973) ("The fact that one is intoxicated at the time a confession is made does not necessarily render him incapable of comprehending the meaning and effect of his words. Therefore, proof that an accused was intoxicated at the time he made a confession does not render the statement inadmissible as a matter of law, unless the accused's intoxication was such that he did not realize what he was saying."). Additionally, though surely a source of embarrassment when he urinated on himself, the only evidence is that this occurred before the LEC interview began, Sledge was not made to remain in soiled clothes but changed into a jumpsuit after the incident, he

was not denied any comfort requests during his interview, and no statements of substance were made by him between the time of his initial request to use the bathroom and him relieving himself. Further, Sledge appeared relaxed and forthcoming with details in the recording of this interview, and we detect no coercive forces or anything to indicate Sledge's will was overborne. *See State v. Goodwin*, 384 S.C. 588, 601, 683 S.E.2d 500, 507 (Ct. App. 2009) ("The test of voluntariness [of a statement] is whether a defendant's will was overborne by the circumstances surrounding the giving of a confession.").

Based upon the content of the videos and the testimony presented, the trial court thoughtfully considered the fact that Sledge was *Mirandized* twice; his rights were clearly and carefully explained; Sledge paid close attention to the rights explained to him and acknowledged his waiver of rights in writing; and the atmosphere in the interview room was not hostile and there was no evidence of coercion or pressure to the extent his will was overborne. It further recognized there was evidence of Sledge's intoxication and his denied use of the bathroom but determined these circumstances did not take away his ability to understand, process information and make rational decisions nor interfere with the voluntariness of the statement or his knowing and intelligent waiver of his rights under *Miranda*. We hold the trial court's determination on this matter is supported by evidence and find no abuse of discretion in the admission of Sledge's statements. *See State v. Saltz*, 346 S.C. 114, 136, 551 S.E.2d 240, 252 (2001) ("The trial court's factual conclusions as to the voluntariness of a statement will not be disturbed on appeal unless so manifestly erroneous as to show an abuse of discretion."); *id.* ("When reviewing a trial court's ruling concerning voluntariness, [the appellate court] does not reevaluate the facts based on its own view of the preponderance of the evidence, but simply determines whether the trial court's ruling is supported by any evidence.").

## III. Sentence on Weapon Charge

Finally, Sledge contends the trial court erred in sentencing him to five years of incarceration for possession of a weapon during the commission of a violent crime because he was sentenced to life for his murder conviction, and statutory law prohibits such a sentence when a life sentence without parole is imposed for a violent crime. Accordingly, he argues this sentence should be vacated. Though he acknowledges defense counsel did not raise an objection to the improper imposition of this sentence, Sledge argues this court should nonetheless review the issue in the interest of judicial economy. The State acknowledges that Sledge's weapon possession sentence should be vacated because it was issued in violation of the statute and further concedes Sledge is entitled to the proper sentence

regardless of issue preservation.  We agree and vacate the five-year sentence for possession of a weapon during the commission of a violent crime.  *See* S.C. Code Ann. § 16-23-490(A) (2015) (providing the five-year sentence for possession of a weapon during the commission of a violent crime "does not apply in cases where the death penalty or a life sentence without parole is imposed for the violent crime"); *State v. Bonner*, 400 S.C. 561, 564, 735 S.E.2d 525, 526 (Ct. App. 2012) (noting, though a challenge to sentencing must be raised at trial to be preserved for appellate review, an exception to the rule authorizes the appellate court to consider an unpreserved issue in the interest of judicial economy under appropriate circumstances); *State v. Johnston*, 333 S.C. 459, 463-64, 510 S.E.2d 423, 425 (1999) (remanding for resentencing in a case which "present[ed] the exceptional circumstance in which the State has conceded in its briefs and oral argument that the trial court committed error by imposing an excessive sentence"); *State v. Vick*, 384 S.C. 189, 202-03, 682 S.E.2d 275, 281-82 (Ct. App. 2009) (finding, under circumstances in which the State conceded it was error for the trial court to sentence a defendant for the kidnapping of a victim whom he was also convicted of murdering and that any such sentence for kidnapping should be vacated, it was appropriate to vacate the sentence for kidnapping even though the defendant failed to challenge the sentence when it was imposed).

Based on the above, we find no error in the admission of the portions of the 911 call or Sledge's statements and therefore confirm Sledge's convictions.  However, we find the trial court erred in imposing the five-year sentence on the weapon charge and, accordingly, vacate that sentence.

**AFFIRMED IN PART AND VACATED IN PART.**

**SHORT and WILLIAMS, JJ., concur.**