623 S.E.2d 122

**The STATE, Respondent,**

v.

**Patrick B. WALKER, Appellant.**

**No. 4049.**

Court of Appeals of South Carolina.

Submitted Nov. 1, 2005.

Filed Nov. 28, 2005.

Nov. 28, 2005.

644

646

Susannah Ross, of Greenville, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka and Assistant Attorney General Derrick K. McFarland, all of Columbia; and Solicitor Robert M. Ariail, of Greenville, for Respondent.

ANDERSON, J.

Patrick B. Walker appeals his conviction for the murder of Rodrekus King. We affirm.[1]

## FACTUAL/PROCEDURAL BACKGROUND

On Thursday, March 21, 2002, Earnetta King served dinner to her boyfriend, Patrick Walker, and to her three children: Rodrekus, Brittany and Javario. As the family gathered to eat, King tasted the food and accused someone of "adding something." After denying that he had added anything, Walker blamed Rodrekus. Rodrekus refuted the accusation. Walker responded by slapping Rodrekus in the head. At that point, King sent Brittany and Javario to their rooms. At 2:15 a.m. on Friday, March 22, 2002, Rodrekus was pronounced dead as a result of multiple blunt-force injuries.

Brittany King was nine years old at the time of her brother's death. She testified that after getting sent to her room, she proceeded into Rodrekus's room to watch cable television. Before long, Brittany observed Walker pushing Rodrekus into the bedroom where she was. According to Brittany, Walker was kicking and punching Rodrekus in the head, back and stomach. Shocked, Brittany watched as Walker hit her brother with a metal broom stick on the left side of his body. Rodrekus, who was naked, begged Brittany to help him, but

---

1. We decide this case without oral argument pursuant to Rule 215, SCACR.

Walker laughed, told her to "shut up," and pushed her away. Finally, Walker ordered Brittany out of Rodrekus's room, but she could hear the fighting continue as she went to sleep that night. Later, Brittany was awakened by a loud "booming" sound. She went back to sleep but woke up again when she heard ambulance sirens. Shortly thereafter, King's father came to pick up Brittany and Javario. Before they left, Walker kissed Brittany on the cheek and threatened her saying, "[d]on't tell the police anything. If you do, then I'll kill you and your momma."

At 12:47 a.m. on March 22, paramedics were alerted that a thirteen-year-old boy had fallen, hit his head in the kitchen, and was having a seizure. By 12:54 a.m., the EMS workers had arrived at Earnetta King's residence. They found Rodrekus unclothed, pulseless, and unresponsive, laying face-up on the floor. A shirtless Walker was attempting CPR. Immediately, the EMS workers prepped Rodrekus for transport to the Greenville Memorial Hospital. At 2:15 a.m., Dr. Allison Jones, an emergency room pediatric physician, declared Rodrekus dead.

As Rodrekus was rushed to the hospital, Deputy Tangie Saylors escorted King to the Law Enforcement Center where she gave her statement to Investigator Paul Silvaggio. King admitted whipping her son with a belt, thick switch, and metal-handled broom because she was upset with him for getting suspended from school. Additionally, King confessed that she was "out of control" and could not stop hitting Rodrekus on his side and shoulder. Because Rodrekus kept moving around as she was hitting him, King accidentally struck his head with the metal handle. King stated Rodrekus fell in the kitchen and hit his head on the counter. At that point, she ran him a bath. As he was getting out of the bathtub, Rodrekus slipped, fell, and hit his head again. According to King, Rodrekus went into convulsions. She asked Walker for help, while she called 911.

At trial, King changed her testimony. King professed that Walker was the sole assailant. When she attempted to intervene, Walker hit her.

Patrick Walker drove himself to the police station after Rodrekus was transported to the hospital. Around 5 a.m. on

March 22, Walker issued a statement to Investigator Silvaggio denying any culpability. After Investigator Silvaggio received statements from both King and Walker, he allowed them to leave. Investigator Silvaggio explained that they were not under arrest, but requested that they go home and stay there in case the police needed more information.

On the afternoon of March 22, Investigator Silvaggio attempted to serve Walker with an arrest warrant at his residence. Neither he nor King was home. Over the following weekend, Investigator Silvaggio visited Walker's cousin while looking for Walker. Investigator Silvaggio found Walker's clothing at the cousin's house. At that point, Investigator Silvaggio notified the fugitive squad because he feared that Walker could be on the run. Walker turned himself in on Monday morning, March 25, 2002.

Dr. Allison Jones and Dr. Michael Ward were called as expert witnesses for the State. Dr. Jones stated that she and the emergency room staff at Greenville Memorial were "horrified" by the number of bruises and cuts on Rodrekus' body. According to the coloration of the bruises and the absence of any healing, most of the bruises "looked fairly fresh." In addition, half of Rodrekus' back was one big bruise.

Dr. Jones testified in detail regarding the injuries sustained by Rodrekus:

> Large freshly bleeding abrasion ... with [extensive] scalp hematoma.... He also had a ... scabbed over abrasion to the top of the left ear.... Had ... multiple scabbed cuts and abrasions over the tops of both of his shoulders, a very linear bruise in the middle of his chest, and an area with some superficial cuts and abrasions with a surrounding bruise. The center area, he had a circular shaped bruise with these two linear pieces off of the edge of that circular bruise. Another one-by-one centimeter abrasion or scrape to the inner surface of his arm, and a bruise with a circular or a crescent-shaped end and two linear streaks extending from that crescent-shaped area.... And another extensive massive bruise that had a lot of linear marks that overlapped and were through this area in different directions, indicating that there was some contact with something to make these lines in a variety of directions.

He also had some torn skin with bruised edges, some reddish subcuticular tissue.... Another linear bruise [on] ... the inner surface of his knee, and multiple scabbed cuts and abrasions across the front parts of both of his legs.

. . . .

This also was another large bruised area that again covers—this is the bottom of his scapula or his shoulder blade, and this ... is the top of the hip or the top of his buttocks, and the bruise was about half of his back and obviously covered to the midline again.....

He had another avulsed or torn piece of skin, J-shaped or circular in shape to the top of it with a linear or small cut that ... appeared to ... have the same pattern as the bruising on the front, but the skin was torn with a cut from that.

Another small cut to the soft tissue or the fleshy tissue of his buttocks, a three centimeter bruise up here on the back of his right arm. Also interesting was that he had a lot of avulsed, torn skin into his fingers and his hand ... where the skin looked like it had been torn not cut. He had two side-by-side linear bruises ... looking much like the pattern on the front that we saw with the lines.... [A] bruise ... took up a good portion of his right side with a lot of that bruising over soft, fatty tissue over the buttocks.

Dr. Jones documented an extensive hematoma that covered half of Rodrekus's head. The skin on his entire body was torn with bruised edges. When asked if the bruises on Rodrekus's body would correspond with a fall in the kitchen or bathtub, Dr. Jones answered: "Absolutely not."

Dr. Ward, a forensic pathologist and the medical examiner for Greenville County, examined Rodrekus post-mortem. Dr. Ward explained:

[I]n the chest and abdomen region there are multiple contusions and abrasions, or bruises and scratches.... This is a patterned bruise of the skin which is often made by a cylindrical object that when it strikes the skin pushes the blood out to either side, causing a parallel type of bruise.... So this is here on the left anterior chest or the left front portion of the chest.

There are ... deep scratches or abrasions on the chest and upper arm here at the shoulder, just to the left of nipple, and overlying the ribs.... [T]here was blood within the underlying subcutaneous tissues and musculature of the chest.....

Down on the abdomen there is a similar, again, parallel contusion of the skin.....

....

... [T]here was hemorrhage in basically three layers as we went down deeper ... into the body. First, the fat of the large intestine, then the small intestine, and then the deep tissues surrounding the pancreas and actually hemorrhage into the pancreas itself.

... [On the thighs], there are ... patterned contusions or bruises of the skin.... All of these ... injuries [except one] showed no indication ... that they were old, ... they all appeared fresh with no healing.

The skin of the buttocks was diffusely bruised, much like the hands and the wrists. And multiple incisions were made into the skin and underlying musculature of the buttocks, and there was a great deal of hemorrhage within the skin and musculature of both sides of the buttocks....

....

... [T]he injuries to the head of Rodrekus were limited to the left side and left back of his scalp. There were three separate distinct injuries.... [There was] an area of abrasion or a scratch right in front of the left ear, right at the top portion of the left ear. This is a linear abrasion right here, and this larger wound is a laceration or a tear in the skin, ... caused by a blunt object with enough force to actually split the skin open or cause a laceration.... Rodrekus' scalp ... was detached from the underlying bone.

... [T]here was a collection of blood [in the scalp] called subgaleal hemorrhage.... [O]n top of the brain there was a collection of blood called subdural blood. And then overlying the surface of the brain on the right and left ... sides and overlying the cerebellum, ... there was subarachnoid hemorrhage.... The brain was swollen....

Dr. Ward found: (1) bruising and hemorrhaging on Rodrekus's arms, which were characteristic of defense-type injuries;

and (2) bruising and abrasions on Rodrekus' back. When Dr. Ward was asked if Rodrekus' injuries were consistent with him "having fallen down in the bathroom ... and struck his head on the bathtub," Dr. Ward responded: "I think it would be inconsistent with that.... This is not simply from a fall. This is from multiple impacts to the side of the head.... [T]o receive this total constellation of injuries to the head region is not consistent with the fall but from several blows." During the autopsy, Dr. Ward was provided with "possible weapons" to compare to Rodrekus' injuries. He stated several of the injury patterns were consistent with the "possible weapons" provided to him: a broom and a belt buckle. When questioned as to how Rodrekus received the injuries to his intestines and pancreas, Dr. Ward opined:

A particular pattern of injury that we see in forensics is a blow with a fairly blunt object, often described as either a fist or a foot, from a punch or a stomp will leave an injury pattern like this.... [I]f the abdomen is soft enough or if the musculature of the abdomen is flaccid, then this fist or foot can completely compress the skin in the abdomen and basically squash or compress the organs between the skin and the backbone. And I think that's what happened in this case, that the large intestine and its fat were trapped; the small intestine and its fat were trapped; and the pancreas were all basically compressed by this striking object, causing the hemorrhage within that region.... It would have to be a very hard blow to cause hemorrhage around the pancreas, which is very deep.

Walker and King were convicted of murder. Both were sentenced to life imprisonment.

### STANDARD OF REVIEW

In criminal cases, the appellate court sits to review errors of law only. *State v. Wilson,* 345 S.C. 1, 545 S.E.2d 827 (2001); *State v. Cutter,* 261 S.C. 140, 199 S.E.2d 61 (1973); *State v. Butler,* 353 S.C. 383, 577 S.E.2d 498 (Ct.App.2003). On appeal, we are limited to determining whether the trial judge abused his discretion. *State v. Reed,* 332 S.C. 35, 503 S.E.2d 747 (1998); *State v. Bowie,* 360 S.C. 210, 600 S.E.2d 112 (Ct.App.2004). An abuse of discretion occurs when the

trial court's ruling is based on an error of law. *State v. McDonald*, 343 S.C. 319, 540 S.E.2d 464 (2000); *State v. Foster*, 354 S.C. 614, 582 S.E.2d 426 (2003); *State v. Adams*, 354 S.C. 361, 580 S.E.2d 785 (Ct.App.2003).

This Court does not reassess the facts based on its own view of the preponderance of the evidence but simply determines whether the trial judge's ruling is supported by any evidence. *Wilson*, 345 S.C. at 6, 545 S.E.2d at 829; *State v. Mattison*, 352 S.C. 577, 575 S.E.2d 852 (Ct.App.2003). Furthermore, this Court is bound by the trial court's factual findings unless they are clearly erroneous. *State v. Quattlebaum*, 338 S.C. 441, 527 S.E.2d 105 (2000); *State v. Landis*, 362 S.C. 97, 606 S.E.2d 503 (Ct.App.2004).

## *LAW/ANALYSIS*

### I. Evidence of Defendant's Flight

Walker claims the trial court erred in admitting evidence of his flight. We disagree.

Flight from prosecution is admissible as evidence of guilt. *State v. Crawford*, 362 S.C. 627, 608 S.E.2d 886 (Ct. App.2005); *State v. Pagan*, 357 S.C. 132, 591 S.E.2d 646 (Ct.App.2004), *cert. granted* (Oct. 5, 2005); *State v. Al–Amin*, 353 S.C. 405, 578 S.E.2d 32 (Ct.App.2003); *see also State v. Ballenger*, 322 S.C. 196, 200, 470 S.E.2d 851, 854 (1996) (stating flight is "at least some evidence" of defendant's guilt); *State v. Freely*, 105 S.C. 243, 89 S.E. 643 (1916) (declaring the flight of one charged with crime has always been held to be some evidence tending to prove fault). Likewise, evidence of flight has been held to comprise proof and signify evidence of defendant's guilty knowledge and intent. *See State v. Beckham*, 334 S.C. 302, 513 S.E.2d 606 (1999); *Town of Hartsville v. Munger*, 93 S.C. 527, 77 S.E. 219 (1913); *Pagan*, 357 S.C. 132, 591 S.E.2d 646; *State v. Brownlee*, 318 S.C. 34, 455 S.E.2d 704 (Ct.App.1995); *see also State v. Thompson*, 278 S.C. 1, 292 S.E.2d 581 (1982) (finding evidence of flight admissible to show guilty knowledge, intent, and that defendant sought to avoid apprehension), *overruled on other grounds by State v. Torrence*, 305 S.C. 45, 406 S.E.2d 315 (1991); *State v. Grant*, 275 S.C. 404, 407, 272 S.E.2d 169, 171

(1980) ("[A]ttempts to run away have always been regarded as some evidence of guilty knowledge and intent.") (internal quotation marks omitted); *State v. Davis*, 354 S.C. 348, 580 S.E.2d 778 (Ct.App.2003) (noting that circumstances of defendant's flight from police after the attempted traffic stop allowed reasonable inference of guilty conduct). Unexplained flight is admissible as indicating consciousness of guilt, for it is not as likely that one who is blameless and conscious of that fact would flee. *See Crawford*, 362 S.C. at 635, 608 S.E.2d at 890; *State v. Williams*, 350 S.C. 172, 564 S.E.2d 688 (Ct.App. 2002).

 Flight or evasion of arrest is an issue for the jury to consider. *See Beckham*, 334 S.C. at 315, 513 S.E.2d at 612; *State v. Turnage*, 107 S.C. 478, 93 S.E. 182 (1917). "In South Carolina, we recognize that evidence of flight [is] proper. We also recognize that it is oftentimes appropriate for counsel to argue to the jury the inferences growing out of flight." *State v. Byers*, 277 S.C. 176, 177–78, 284 S.E.2d 360, 361 (1981) (internal quotations omitted); *see also Grant*, 275 S.C. at 408, 272 S.E.2d at 171 (stating that while a jury charge on flight as evidence of guilt is improper, admission of evidence and argument by counsel concerning it are allowed). The critical factor to the admissibility of evidence of flight is whether the totality of the evidence creates an inference that the defendant had knowledge that he was being sought by the authorities. *Beckham*, 334 S.C. at 315, 513 S.E.2d at 612; *Crawford*, 362 S.C. at 636, 608 S.E.2d at 891. It is sufficient that circumstances justify an inference that the accused's actions were motivated as a result of his belief that police officers were aware of his wrongdoing and were seeking him for that purpose. *Crawford*, 362 S.C. at 636, 608 S.E.2d at 891.

There is ample evidence that Walker fled his residence after Investigator Silvaggio asked him to stay at or nearby his home. First, Investigator Silvaggio tried to serve the arrest warrant at his domicile, but neither Walker nor King was there. At that time, Investigator Silvaggio searched for Walker at his relatives' homes, but instead of finding Walker, he found the clothes Walker had been wearing the night Rodrekus was killed. Because of Walker's unexplained absence, Investigator Silvaggio was forced to notify the fugitive squad. Although Walker argues he was not aware that he had been

charged with a crime and therefore could not have been avoiding arrest, he turned himself into the police on Monday. Moreover, it can be inferred from his sudden disappearance that Walker was either expecting the police to arrest him or he was planning his escape.

In South Carolina, a defendant's flight is admissible evidence. Thus, the trial judge in the instant case did not abuse his discretion by allowing evidence of Walker's flight.

## II. Severance

### A. Abuse of Discretion

Walker argues the trial court abused its discretion in failing to sever his trial from that of Earnetta King. We find no error.

Criminal defendants who are jointly tried for murder are not entitled to separate trials as a matter of right. *State v. Kelsey*, 331 S.C. 50, 502 S.E.2d 63 (1998); *State v. Nichols*, 325 S.C. 111, 481 S.E.2d 118 (1997); *see also State v. Garrett*, 350 S.C. 613, 567 S.E.2d 523 (Ct.App.2002) (clarifying that codefendants are not entitled to separate trials as a matter of right). A motion for severance is addressed to the sound discretion of the trial court. *State v. Harris*, 351 S.C. 643, 572 S.E.2d 267 (2002); *State v. Tucker*, 324 S.C. 155, 478 S.E.2d 260 (1996); *State v. Simmons*, 352 S.C. 342, 573 S.E.2d 856 (Ct.App.2002). The trial court's ruling will not be disturbed on appeal absent an abuse of that discretion. *Tucker*, 324 S.C. at 164, 478 S.E.2d at 265; *State v. Prince*, 316 S.C. 57, 447 S.E.2d 177 (1993); *Simmons*, 352 S.C. at 350, 573 S.E.2d at 860. An abuse of discretion occurs when a trial court's decision is unsupported by the evidence or controlled by an error of law. *State v. Lopez*, 352 S.C. 373, 574 S.E.2d 210 (Ct.App.2002).

There can be no clearly defined rule for determining when a defendant is entitled to a separate trial, because the exercise of discretion means that the decision must be based upon a just and proper consideration of the particular circumstances which are presented to the court in each case. *State v. McIntire*, 221 S.C. 504, 71 S.E.2d 410 (1952); *State v. Castineira*, 341 S.C. 619, 535 S.E.2d 449 (Ct.App.2000), *aff'd,*

351 S.C. 635, 572 S.E.2d 263 (2002). A severance should be granted only when there is a serious risk that a joint trial would compromise a specific trial right of a codefendant or prevent the jury from making a reliable judgment about a codefendant's guilt. *Harris,* 351 S.C. at 652–53, 572 S.E.2d at 273; *State v. Dennis,* 337 S.C. 275, 523 S.E.2d 173 (1999). An appellate court should not reverse a conviction achieved at a joint trial in the absence of a reasonable probability that the defendant would have obtained a more favorable result at a separate trial. *Hughes v. State,* 346 S.C. 554, 552 S.E.2d 315 (2001).

A defendant who alleges he was improperly tried jointly must show prejudice before this court will reverse his conviction. *Dennis,* 337 S.C. at 281, 523 S.E.2d at 176; *State v. Crowe,* 258 S.C. 258, 188 S.E.2d 379 (1972); *see also State v. Thompson,* 279 S.C. 405, 308 S.E.2d 364 (1983) (noting that for reversal, a defendant who was tried jointly must show prejudice). The general rule allowing joint trials applies with equal force when a defendant's severance motion is based upon the likelihood he and a codefendant will present mutually antagonistic defenses, i.e., accuse one another of committing the crime. *Hughes,* 346 S.C. at 559, 552 S.E.2d at 317; *Dennis,* 337 S.C. at 281, 523 S.E.2d at 176. The rule allowing joint trials is not impugned simply because the codefendants may present evidence accusing each other of the crime. *Dennis,* 337 S.C. at 281, 523 S.E.2d at 176; *State v. Smith,* 359 S.C. 481, 597 S.E.2d 888 (Ct.App.2004).

The trial judge must act cautiously in allowing a joint trial. *Dennis,* 337 S.C. at 281, 523 S.E.2d at 176. The judge must carefully consider problems that may arise from a joint trial, such as redacted statements, and must assure protection of each defendant's constitutional right to confront witnesses against him. *Id.* at 281–82, 523 S.E.2d at 176; *State v. Singleton,* 303 S.C. 313, 400 S.E.2d 487 (1991). A proper cautionary instruction may help protect the individual rights of each defendant and ensure that no prejudice results from a joint trial. *Hughes,* 346 S.C. at 559, 552 S.E.2d at 317; *State v. Stuckey,* 347 S.C. 484, 556 S.E.2d 403 (Ct.App.2001); *see also State v. Holland,* 261 S.C. 488, 494, 201 S.E.2d 118, 121 (1973) (finding trial court's cautionary instructions to the jury

in a joint trial "protected the rights of each individual appellant").

Walker asserts he should have been granted a separate trial because of antagonistic defenses between himself and King. Each blames the other for the murder of Rodrekus. These antagonistic defenses do not constitute the requisite prejudice. More importantly, the trial judge had discretion to determine whether Walker should have been granted a separate trial. Based on the evidence, the judge determined that separate trials were not needed. Walker is not entitled to a separate trial as a matter of right. We find no error in the trial judge's determination.

### B. Curative Instruction

Walker alleges he was denied a fair trial based on the cross-examination testimony elicited from Investigator Silvaggio; the self-serving testimony of the co-defendant, Earnetta King; and testimony from the EMS worker. Therefore, he maintains his motion for severance should have been granted. We disagree.

Generally, a curative instruction is deemed to have cured any alleged error. *State v. Patterson,* 337 S.C. 215, 522 S.E.2d 845 (Ct.App.1999); *State v. Greene,* 330 S.C. 551, 499 S.E.2d 817 (Ct.App.1997). "If the trial judge sustains a timely objection to testimony and gives the jury a curative instruction to disregard the testimony, the error is deemed to be cured." *State v. George,* 323 S.C. 496, 476 S.E.2d 903 (1996); *State v. Craig,* 267 S.C. 262, 227 S.E.2d 306 (1976); *State v. McCord,* 349 S.C. 477, 562 S.E.2d 689 (Ct.App.2002). A curative instruction to disregard incompetent evidence and not to consider it during deliberation is deemed to have cured any alleged error in its admission. *See State v. Kelsey,* 331 S.C. 50, 502 S.E.2d 63 (1998); *State v. Jones,* 325 S.C. 310, 479 S.E.2d 517 (Ct.App.1996).

Because a trial court's curative instruction is considered to cure any error regarding improper testimony, a party must contemporaneously object to a curative instruction as insufficient *or* move for a mistrial to preserve an issue for review. *George,* 323 S.C. at 510, 476 S.E.2d at 912; *Patterson,* 337 S.C. at 226, 522 S.E.2d at 850. Therefore, this issue may

not be preserved for review because the trial court sustained defense counsel's objections and gave a thorough curative instruction without objection or request for a mistrial.

Assuming arguendo the issue is preserved, adverting to the merits in the case *sub judice*, on four separate occasions the judge gave a curative instruction to the members of the jury. Each time, the curative instruction was timely and complete.

As Investigator Silvaggio was being questioned, the judge determined that a question and an answer were both inappropriate and should be stricken from the record. The judge elucidated:

[T]here was a question that was asked of this witness and the response was given by the witness. The question was: "do you remember what she said?" And the response was: "She indicated that Patrick Walker was the one that was beating Rodrekus and that she was trying to intervene in the assault between Patrick Walker and Rodrekus. As a result of that, she too sustained injuries to her head, and that Patrick Walker was the sole assailant in the case." . . . I have made a ruling that that question as well as the response was inappropriate at that stage and, therefore, you will disregard that question and also the witness's response.

During King's testimony, the judge properly gave a curative instruction: "Prior to the break in the testimony, the defendant made an unsolicited statement about some prior bad acts of Mr. Walker, and I will instruct you and you are ordered that you will disregard that statement by this defendant, and you are not to consider that statement in any form during your deliberations."

The EMS worker testified regarding Walker's intimidating demeanor. Immediately, the judge charged: "I ask the jury be instructed to disregard. You may disregard the last statement by the witness." Prior to deliberations, the judge instructed:

As the trial judge it is my responsibility to preside over the trial of this case. And I have also the duty to rule on the admissibility of evidence offered during this trial. You are to consider only the competent evidence before you. If there was any testimony offered stricken from the record in this case during this trial, you must disregard that testimo-

ny. You are to consider only the testimony which has been presented from this witness stand, any evidence which has been made part of the record in this case and any stipulations of counsel.

In compliance with the law extant on curative instructions, the trial judge responded with alacrity and exactitude when the inadmissible evidence was offered. The potency of the judge's curative instructions expunged and extirpated any alleged error. Concomitantly, the motion for severance was properly denied.

### C. Closing Argument

 Walker contends improper statements made by the co-defendant's attorney during closing argument deprived him of a fair trial. Thus, he claims his motion for severance was erroneously denied.

 Initially, we note this issue may not be preserved for appellate review. An issue may not be raised for the first time on appeal, but must have been raised to the trial judge to be preserved for appellate review. *See State v. Weik,* 356 S.C. 76, 587 S.E.2d 683 (2002); *State v. Carlson,* 363 S.C. 586, 611 S.E.2d 283 (Ct.App.2005); *see also State v. Passmore,* 363 S.C. 568, 611 S.E.2d 273 (Ct.App.2005) (instructing that general rule of issue preservation states that if issue was not raised and ruled upon below, it will not be considered for first time on appeal). Failure to object to comments made during argument precludes appellate review of the issue. *Carlson,* 363 S.C. at 606, 611 S.E.2d at 293; *State v. Varvil,* 338 S.C. 335, 526 S.E.2d 248 (Ct.App.2000). Walker did not contemporaneously object to the comments made by co-defendant's counsel during closing argument. Consequently, this issue is not preserved.

### III. Subject Matter Jurisdiction

 Walker claims the trial court lacked subject matter jurisdiction due to a faulty indictment. We disagree.

In *State v. Gentry,* 363 S.C. 93, 610 S.E.2d 494 (2005), our Supreme Court edified:

[I]f an indictment is challenged as insufficient or defective, the defendant must raise that issue before the jury is sworn

and not afterwards. *See* S.C.Code Ann. § 17–19–90 (2003) ("Every objection to any indictment for any defect apparent on the face thereof shall be taken by demurrer or on motion to quash such indictment before the jury shall be sworn and not afterwards."). However, a defendant may for the first time on appeal raise the issue of the trial court's jurisdiction to try the class of case of which the defendant was convicted.

. . . .

The indictment is a notice document. A challenge to the indictment on the ground of insufficiency must be made before the jury is sworn as provided by § 17–19–90. If the objection is timely made, the circuit court should judge the sufficiency of the indictment by determining whether (1) the offense is stated with sufficient certainty and particularity to enable the court to know what judgment to pronounce, and the defendant to know what he is called upon to answer and whether he may plead an acquittal or conviction thereon; and (2) whether it apprises the defendant of the elements of the offense that is intended to be charged. In determining whether an indictment meets the sufficiency standard, the court must look at the indictment with a practical eye in view of all the surrounding circumstances. Further, whether the indictment could be more definite or certain is irrelevant.

*Id.* at 101–03, 610 S.E.2d at 499–500 (internal citations and footnote omitted).

There was no challenge to the indictment prior to the jury being sworn. Based on *Gentry,* because Walker did not raise the sufficiency of the indictment before the jury was sworn, he cannot now raise this issue on appeal. The issue is not preserved for our review.

### CONCLUSION

Accordingly, Walker's conviction and sentence are

**AFFIRMED.**

GOOLSBY and SHORT, JJ., concur.