**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
In The Court of Appeals

The State, Respondent,

v.

Stephen Grant Parten, Appellant.

Appellate Case No. 2019-000326

Appeal from Anderson County
J. Cordell Maddox, Jr., Circuit Court Judge

Unpublished Opinion No. 2022-UP-364
Heard February 17, 2022 – Filed September 28, 2022

**AFFIRMED**

Appellate Defender Jessica M. Saxon, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson and Senior Assistant Attorney General David A. Spencer, both of Columbia; and Solicitor David Rhys Wagner, Jr., of Anderson, all for Respondent.

**PER CURIAM:** Stephen G. Parten appeals his convictions for voluntary manslaughter, second-degree assault and battery, possession of a weapon during the commission of a violent crime, second-degree burglary, and grand larceny.

Parten argues the trial court erred in denying his motion to sever his charges for burglary and grand larceny from the remaining charges; admitting the recording of a 911 phone call; and, admitting a photograph of the deceased over his objection pursuant to Rule 403, SCRE. We affirm.

On May 26, 2016, Parten fatally shot Ahmed Fallous. Several days later, Parten was apprehended in Tennessee while driving a stolen vehicle. An Anderson County grand jury indicted Parten for murder, kidnapping, attempted murder, possession of a weapon during the commission of a violent crime, grand larceny, and first-degree burglary.[1] Parten was tried before a jury from February 11 through 15, 2019.

Prior to trial, Parten moved to sever the burglary and grand larceny charges from the remaining charges as a violation of due process, citing *State v. Rice*.[2] Parten argued the offenses were not all part of a single chain of circumstances, part of the same general nature, or proved by the same evidence and further, that a conviction for the burglary charges could allow the jury to draw an improper inference that he was guilty of the other, more serious charges. The State argued Parten's conduct that followed the May 26 incidents, including the burglary and larceny, was a continuous chain of events and constituted evidence of flight. The State asserted the evidence of flight was probative of Parten's guilt as to the murder and related charges. The trial court denied the motion to sever, concluding "it probably [wa]s one continuous act, even though it [wa]s separated by four to five days."

Parten next moved to suppress the recording of Thomas Francis's 911 call as inadmissible hearsay, citing to *State v. Hendricks*.[3] Parten argued the call consisted almost entirely of Francis repeating statements another witness, Morgan Rhodes, made to him. After listening to the recording, the trial court stated, "I think I could hear what she was saying, quite frankly, better than what . . . [Francis] was saying" and that it sounded like Francis was "just literally repeating

---

[1] The State moved without objection to amend the charge in the burglary indictment to the lesser-included offense of second-degree burglary.
[2] 368 S.C. 610, 629 S.E.2d 393 (Ct. App. 2006) (holding when a defendant's arrest for trafficking in cocaine arose out of a traffic stop police set up because they suspected the defendant of murder, the trial court did not abuse its discretion in refusing to sever the charges for murder and trafficking in cocaine).
[3] 408 S.C. 525, 759 S.E.2d 434 (Ct. App. 2014) (holding the trial court erred in admitting mother's statement repeating daughter's statement that the defendant had broken into her house, beat her up, and raped her).

what [Rhodes] was saying." The trial court found Rhodes's statements during the call were admissible as an excited utterance. The trial court opined Francis's statements were "repeating literally what [Rhodes] said," and "what he was doing was almost interpreting." The trial court stated it did not believe Francis's statements were double hearsay because had Rhodes made the phone call, her statements would have been admissible under the excited utterance exception. The trial court stated it was not concerned by the fact Francis was "acting as a go-between between the 911 operator and [Rhodes]" and that, unlike *Hendricks*, there was little delay between Rhodes's statement and Francis's repetition of the statement.

At trial, Francis testified he was on his way to work around 3:00 a.m. on May 26, 2016, when he drove past a wrecked car and saw a woman in the backseat with blood on her hair and face, attempting to flag him down. Francis called 911 and returned to the wrecked car. He remained on the phone with 911 and spoke to the woman to ensure she was all right and asked questions prompted by the 911 dispatcher. The woman identified herself as Morgan Rhodes and explained Parten injured her and potentially killed her boyfriend, Fallous. Rhodes stated Parten fled into the wooded area near the road. During the 911 call, Francis told the operator Rhodes was covered in blood and was "saying something about a shooting." Francis conveyed that Rhodes, her boyfriend, and her boyfriend's friend had been in the vehicle. Rhodes also said "someone shot a friend of hers and that he was shooting at the car after he ran it into a tree." Rhodes further stated, "He tried to kill me." Francis asked Rhodes if it was her boyfriend who "did this to [her]" and she responded it was her boyfriend's friend, Stephen. Rhodes stated, "Stephen, the one who did this . . . said [Fallous] is going to end up killing [me] or something . . . and then he just started—but why would he start beating me? [Fallous] has never done this to me." Francis then stated, "She thinks her boyfriend might be hurt as well," at which point Rhodes said, "He said he killed him" and "he said he shot him." Francis asked Rhodes again "who did this" to her, and Rhodes said, "He said he would kill me if I told" and eventually gave Stephen's last name, Parten. The 911 operator asked about Fallous, and Francis said Rhodes was "worried about if he's ok," and Rhodes stated, "I think he might be dead." Francis relayed that Rhodes said the man beat her, she locked him out of the car, he shot towards the car, and he then ran off into the woods. Rhodes stated it had "been a while" since Parten ran into the woods. Francis stated when he first approached the vehicle, it sounded like someone was in the woods. He then drove Rhodes down the street to a church parking lot because the situation did not feel safe. When the 911 operator asked how many shots Rhodes heard, she said "a lot" and that "he shot at [Fallous]" and "he said he killed my boyfriend." Rhodes then stated he shot four

times at the car. She explained, "He hit a tree and then he backed out and he kept going . . . he got stuck in a ditch and his car just started dying, so I locked myself in the car, rolled the windows up and laid on the floor."

Rhodes testified at trial that on the evening of the shooting, Parten visited Fallous at his home and the three of them left to go to Parten's house. Parten drove them in his black SUV, Fallous sat in the front passenger seat, and Rhodes sat in the back. They were traveling on Centerville Road and about to cross a bridge when Parten abruptly stopped because he started throwing up. A verbal altercation between Parten and Fallous ensued. Fallous then offered to drive and jumped into the driver's seat but Parten "rip[ped] him out of the car aggressively" and they began to fight. Rhodes testified Parten pulled out a weapon and Fallous started to run. Parten then shot the gun "a couple of times." Rhodes could not count the number of shots but she felt at least two by her waistline. Rhodes did not see Fallous get shot but she heard him fall down. She recalled that after she heard the gunshots, Parten grabbed her arm, made her get in the car, and started driving "really fast." Rhodes could not recall what Parten said to her when he first got back in the car, but he later told her "[she] was next." She stated Parten was "[s]werving and speeding" and she described his behavior as "[p]sychotic, unhinged." They eventually came to a stop again when Parten hit a tree, backed the car up, and continued driving until he drove into a ditch and the car stopped working. Parten walked around to the front passenger side of the car where she was seated and began "[p]unching, kicking, slapping, strangling, and pistol whipping" her. Rhodes kicked him as hard she could, he started vomiting, and she then locked the doors, rolled the windows up, and lay down in the back seat and ducked. Rhodes was afraid and thought, "[W]e were both going to be dead." After she locked Parten out of the car, she heard what she thought were gunshots and smelled something burning. Rhodes recalled the shots sounded like they were fired at the passenger side of the car and that she last saw Parten on that side of the car but she did not see which direction he went after that. About ten minutes after Parten ran away, she flagged down Francis. Rhodes suffered a concussion, a broken finger, and several minor injuries. She explained she had to have staples in her scalp because Parten had pulled her hair out.

Officer Caleb Carroll, of the Anderson County Sheriff's Office, testified he and another officer responded to a shooting call at Centerville Road around 2:20 a.m. on May 26, 2016, and found Fallous laying against a tree on the side of the road in a wooded area. Officer Carroll explained that as he approached Fallous, Fallous rolled towards the officers and they observed a gun in his right hand. Officer Carroll stated they asked him to drop the gun and he complied. The State moved

to admit several photographs of the scene, including a photograph of the deceased's body (Exhibit 7E). Parten objected to Exhibit 7E "on 403 grounds" and asserted it was "gruesome and intended to inflame the passion of the jury." The trial court then stated, "We have had some discussion off the record. I think that its probative value outweighs its probability of inflaming the passions of the jury," and admitted the photograph over Parten's objection. Officer Carroll testified he approached Fallous after he dropped the gun and the other officer cut off his shirt to try to find his wound. He then asked Fallous who shot him and Fallous said it was Stephen Parten. Officer Carroll explained they found a gunshot wound in Fallous's abdomen and by then, he had no pulse. The officers decided to move Fallous to the roadway to perform CPR because the terrain off the roadway was steep and difficult to work on. Officer Carroll testified CPR was unsuccessful and Fallous was dead by the time EMS arrived.

The forensic pathologist who performed Fallous's autopsy testified his examination revealed a gunshot entry wound to the left back and an exit wound on the front of the body. In addition, he opined Fallous was struck in the forehead with a pistol or handgun and suffered a contusion on the second finger of his left hand that "suggested a defensive-type wound." He determined the cause of death was hemopneumothorax due to the gunshot wound and the death was a homicide.

Officer Sean Proner, a forensic investigator of the Anderson County Sheriff's Office, responded to the wrecked vehicle and then went to the church to meet Francis and Rhodes. Officer Proner observed blood on Rhodes's hands and head and a laceration on her head under her hair. He testified Rhodes appeared very shaken and upset. Officer Proner obtained a gunshot residue (GSR) kit from Rhodes and photographed the black GMC Yukon SUV and Rhodes's injuries. He observed the gas lid on the SUV was open, there was paper in the gas fill along with char and ash, and there was some paper and a lighter on the ground near the SUV. In addition, Officer Proner stated there was a vehicle strike on a tree and a fluid trail leading from the tree to where the SUV was found. Officer Proner processed the inside of the SUV and found blood on the side of the front right passenger door and seat and a business card for "Ashley T. Moore" in the glovebox.

Officer James Wilson, of the Anderson County Sheriff's Office, testified he processed the crime scene on Centerville Road. He photographed and collected evidence from the scene. He stated there was a body in the roadway when he arrived and testified Exhibit 7E depicted what he observed. Officer Wilson collected a .380 Hi-Point handgun, a fired 9mm shell casing, and seven fired .45

caliber shell casings. Most of the shell casings were found on the bridge. James William, of the Greenville County Department of Public Safety Forensic Division Crime Laboratory, testified as an expert in the field of firearm examination and identification. He examined the shell casings collected from the crime scene and determined all of the .45 shell casings were fired from the same firearm but the 9mm casing was fired from a different weapon. William determined the .380 Hi-Point handgun did not fire any of the recovered shell casings.

Elizabeth McCarson testified she knew Parten through her boyfriend, Ashley Moore, who had known Parten for years. McCarson recalled she saw Parten on the night of June 1, 2016, when he pulled into her driveway with his headlights off while she and Moore were sitting in Moore's truck. A Special Weapons and Tactics (SWAT) team previously questioned McCarson and Moore, and they knew Parten was wanted for Fallous's murder. Parten got out and walked towards them. Parten was fidgety, looked "scruffy" and "disheveled," and his hair was long, curly, and wet. McCarson explained Parten got into the backseat of the truck and she turned to face towards him because she was "scared." She indicated Parten said he "had been running through the woods" and had "gotten caught on a lot of briars and limbs and that his clothes had been shredded and that it was easier if he just went ahead and t[ook] off all of the rest of his clothes and ran through the woods because they were kind of grabbing, slowing things down." Parten said he ran through the woods naked and tried to find shelter. She recalled Parten commented that at one point, he hid in the hay in a barn and later he went to another home where he wrapped up in the doormat to try to keep warm. Parten stated he eventually found a home that he was able to enter and he took some clothes from the home and found the keys to the vehicle he was driving that night.

McCarson explained that when she and Moore told Parten he was wanted, he was surprised it was all over the news and seemed very surprised that someone was dead. She recalled Parten commented several times that "[t]he girl just needed to be taken care of." McCarson stated they told Parten he needed to leave. Moore and Parten then discussed trying to "get some kind of tracking off of the vehicle." McCarson explained that before Parten left, she gave Moore a cell phone with a very low charge on it and Moore placed the phone in the backseat of Parten's truck.

Jay Lindsey, an officer with the United States Marshals Task Force, testified his office received a tip from a confidential source who stated they placed a cellphone in the vehicle. Law enforcement used the cellphone to determine Parten was travelling towards the North Carolina-Tennessee border, and the Tennessee Highway Patrol located and arrested him.

Officer Nathan Mitchell, of the Anderson County Sheriff's Office, testified he was the lead investigator in this case. He stated all shell casings recovered from the scene were found on the bridge and were in a pattern that led to where Fallous was found. The 9mm shell casing appeared to have some oxidation and looked like it had been there for a while. Officer Mitchell spoke to Rhodes while she was in the emergency room and observed that in addition to the laceration on her head, she had claw marks on one hand and a broken finger. He noted she was "very hysterical, very emotional, like she had been through some sort of traumatic experience." Officer Mitchell traveled to Tennessee when Parten was arrested and testified it looked like Parten "had been living in the woods for about five days" because he "was covered in scratches[] and had insect bites." Officer Mitchell saw no signs Parten had been in a fight and he did not appear to be injured. He testified Parten was caught while driving a stolen 2014 F-150 truck belonging to Dan Ray, whose home was about one mile through the woods from where Parten's SUV was found. The area consisted mostly of farmland but contained a "couple of residences." Ray testified at trial and explained he last saw his truck around 9:00 p.m. on May 31, 2016. Ray noticed a broken window in the home was slightly open and the truck key, which he kept near the master bedroom, was missing.

The jury found Parten guilty of voluntary manslaughter, second-degree assault and battery, possession of a weapon during the commission of a violent crime, second-degree burglary, and grand larceny. The jury found him not guilty of kidnapping. The trial court sentenced Parten to concurrent sentences of thirty years' imprisonment suspended upon the service of twenty-five years' imprisonment and five years of probation for voluntary manslaughter; ten years' imprisonment for burglary and grand larceny; and, three years' imprisonment for assault and battery. The trial court sentenced Parten to a consecutive term of five years' imprisonment for the weapon charge. This appeal followed.

**ISSUES ON APPEAL**

1. Did the trial court err in denying Parten's motion to sever the burglary and grand larceny charges from the murder, attempted murder, and kidnapping charges?

2. Did the trial court err in admitting the 911 call made by Francis?

3. Did the trial court err in admitting a photograph of the deceased's body over Parten's Rule 403, SCRE, objection?

**STANDARD OF REVIEW**

"In criminal cases, an appellate court sits to review errors of law only. Therefore, an appellate court is bound by the trial court's factual findings unless they are clearly erroneous." *State v. Banda*, 371 S.C. 245, 251, 639 S.E.2d 36, 39 (2006). "The admission of evidence is within the discretion of the trial court and will not be reversed absent an abuse of discretion." *State v. Pagan*, 369 S.C. 201, 208, 631 S.E.2d 262, 265 (2006). "A motion for severance is addressed to the trial court and should not be disturbed unless an abuse of discretion is shown." *State v. Beekman*, 415 S.C. 632, 636, 785 S.E.2d 202, 204 (2016) (quoting *State v. Tucker*, 324 S.C. 155, 164, 478 S.E.2d 260, 265 (1996)).

**ANALYSIS**

1. We hold the trial court did not abuse its discretion in denying Parten's motion to sever. *See id.* ("A motion for severance is addressed to the trial court and should not be disturbed unless an abuse of discretion is shown." (quoting *Tucker*, 324 S.C. at 164, 478 S.E.2d at 265)); *Tucker*, 324 S.C. at 164, 478 S.E.2d at 265 ("Charges can be joined in the same indictment and tried together whe[n] they (1) arise out of a single chain of circumstances, (2) are proved by the same evidence, (3) are of the same general nature, and (4) no real right of the defendant has been prejudiced."); *id.* at 164-65, 478 S.E.2d at 265 (affirming the trial court's refusal to sever a murder charge from subsequent burglary charges and holding "[t]he crimes arose out of a single chain of circumstances because [the defendant] committed the subsequent burglaries solely to avoid capture by police for the [initial] crimes").

As to the first requirement for joinder, evidence supports the trial court's conclusion that Parten's charges all arose out of a single chain of circumstances. We find this case is analogous to *Tucker*. As in *Tucker*, the evidence here shows Parten committed the subsequent burglary and grand larceny solely to avoid capture by police for the events that occurred on May 26. *See State v. Ballenger*, 322 S.C. 196, 200, 470 S.E.2d 851, 854 (1996) (noting the defendant's flight was "at least some evidence of guilt"); *State v. Walker*, 366 S.C. 643, 654, 623 S.E.2d 122, 127 (Ct. App. 2005) ("Flight from prosecution is admissible as evidence of guilt."). Parten told McCarson he had been in the woods for days when he eventually entered Ray's home in search of clothing and took the keys to the truck. From the time he abandoned his SUV until he arrived at McCarson's home, Parten remained in the woods, and the distance between the area where the SUV was found and Ray's home was only about one mile. Once Parten learned from Moore and McCarson that he was wanted for Fallous's murder, he discussed with Moore

how to disable tracking on the stolen vehicle and then traveled to Tennessee. Officer Lindsey testified law enforcement used the cellphone McCarson placed in the stolen truck to determine Parten was travelling towards the North Carolina-Tennessee border, where the Tennessee Highway Patrol located and arrested him. In addition, the offenses occurred within a few days of one another. We conclude the foregoing shows the charges arose out of a single chain of circumstances because Parten's actions following the shooting and leading up to his arrest were part of a continuous course of conduct as evidence of guilty knowledge and an attempt to evade law enforcement.

As to the second requirement for joinder, the same evidence proves both sets of charges. The burglary and grand larceny charges connected Parten to the May 26 offenses because that evidence placed him within about a one-mile radius of where the offenses occurred. McCarson's statements that Parten had been in the woods for five days corroborated Rhodes's statements that Parten absconded into the woods after the shooting and implied Parten was evading law enforcement. McCarson's and Lindsey's testimonies were necessary to establish Parten's guilt for both the burglary and grand larceny charges as well as the May 26 offenses because they implied Parten was evading apprehension for the May 26 offenses.

As to the third requirement, evidence shows the charges were of the same general nature because they were interconnected. *See Rice*, 368 S.C. at 614, 629 S.E.2d at 395 ("Offenses are considered to be of the same general nature where they are interconnected."). According to McCarson's testimony, Parten entered Ray's home to find clothing because he had been hiding naked in the woods for days following the May 26 offenses. In addition, police used a phone in the stolen vehicle to track Parten down for the murder, attempted murder, and kidnapping charges, and stopped him while he was driving the stolen vehicle to arrest him. *See id.* at 615-16, 629 S.C. at 396 (affirming the trial court's refusal to sever charges for murder and trafficking cocaine when the trafficking charges arose out of the investigation for murder).

Finally, we find the trial court's denial of Parten's motion to sever did not prejudice him because the evidence related to the burglary and grand larceny was necessary to present a full account of the case. *See id.* at 616, 629 S.E.2d at 396 (holding the defendant "suffered no prejudice from the joinder of charges because, without the evidence of cocaine trafficking, the jury would not have received an accurate portrayal of the case" and such evidence "was necessary for a full presentation of the case without fragmentation"). Parten also raised a claim of self-defense and we find joinder did not weaken this claim. Rather, other evidence at trial weakened

this defense, including the evidence of flight, Parten's statements to McCarson that "the girl just needed to be taken care of," Rhodes's testimony that he pulled a gun on Fallous and Fallous ran away, and the pathologist's testimony that Fallous was shot in the back. Additionally, according to the investigating officers and the firearms expert, the shell casings were all collected from the same area, leading towards Fallous's body, and although Fallous had a gun, none of the recovered shell casings were fired from that weapon. Thus, we find it was not likely the jury would have convicted Parten of the May 26 offenses based solely on his guilt for the burglary and grand larceny charges. *Cf. State v. Smith*, 322 SC 107, 108-10, 470 S.E.2d 364, 365 (1996) (holding the trial court's denial of the defendant's motion to sever an ABHAN charge from a homicide charge prejudiced defendant because "[t]he [S]tate's case was entirely circumstantial on the homicide charge," and no evidence showed the defendant, rather than the child's mother, committed the homicide or that the defendant had ever hit the deceased child). Based on the foregoing, we hold the trial court did not err in denying Parten's motion to sever.

2. We hold the trial court did not abuse its discretion in admitting the 911 call. As an initial matter, Parten has failed to identify which particular statements made during the thirteen-minute phone call were prejudicial. *See State v. Weston*, 367 S.C. 279, 288, 625 S.E.2d 641, 646 (2006) ("The improper admission of hearsay is reversible error only when the admission causes prejudice."). As to Francis's statements that did not repeat Rhodes's statements, we find these statements were admissible as present sense impressions. *See* Rule 803(1), SCRE (providing "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter" is not excluded by the hearsay rule); *State v. Prather*, 429 S.C. 583, 611, 840 S.E.2d 551, 565 (2020) ("To qualify as a present sense impression[,] '(1) the statement must describe or explain an event or condition; (2) the statement must be contemporaneous with the event; and (3) the declarant must have personally perceived the event.'" (quoting *State v. Hendricks*, 408 S.C. 525, 533, 759 S.E.2d 434, 438 (Ct. App. 2014))). Francis made several observations on the call, including that the vehicle looked like it had been in a wreck and that Rhodes was "covered in blood." He noted Rhodes looked like she had been "beaten somewhat" and stated she was "worried." Francis also remarked the "situation did not feel safe" so he took Rhodes to a nearby church. These statements described the conditions of Rhodes and the situation that Francis observed at the roadside at the same time or very close in time to when he personally perceived them. Thus, we find no error in the admission of these statements.

Next, we hold the trial court did not err in finding Rhodes's direct statements were admissible as excited utterances. *See* Rule 803(2), SCRE (providing "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is not excluded by the hearsay rule); *Prather*, 429 S.C. at 611, 840 S.E.2d at 565-66 ("[T]o be an excited utterance[,] '(1) the statement must relate to a startling event or condition; (2) the statement must have been made while the declarant was under the stress of excitement; and (3) the stress of excitement must be caused by the startling event or condition.'" (quoting *State v. Washington*, 379 S.C. 120, 124, 665 S.E.2d 602, 604 (2008))). First, the evidence demonstrated Rhodes experienced a startling event. She testified that she witnessed Parten shooting at her boyfriend, Fallous, and that Parten attacked her afterwards. After she locked Parten out of the car, she was afraid and thought she heard gunshots and smelled something burning. Second, all of Rhodes's statements at issue related to the event because they described what she experienced. Third, the evidence demonstrated Rhodes's statements during the 911 call were made while she was under the stress of excitement. Rhodes testified Parten ran off about ten minutes before she flagged Francis down. Therefore, her ordeal concluded only moments earlier. In addition, Rhodes sounded tearful and anxious throughout the call, and according to Officers Mitchell's and Proner's testimonies, Rhodes was in an emotional state when officers arrived at the scene and later when she spoke to officers at the hospital. Specifically, Officer Mitchell observed Rhodes was "hysterical" and seemed like she had been through a traumatic event. Officer Proner stated Rhodes appeared very shaken and upset when he spoke to her at the church. According to Francis, Rhodes was "covered in blood" when he found her. The injury to Rhodes's scalp was so severe that she needed staples to close the wound. Several times during the call, Rhodes remarked that she thought she was going to die that night. We find this evidence, including the nature of the event and severity of Rhodes's injuries, demonstrate she made these statements while under the stress of excitement caused by the startling event. Thus, we find the trial court did not err in concluding Rhodes's statements during the 911 call were admissible as excited utterances.

As to Francis's "hearsay within hearsay" statements repeating Rhodes, we find the trial court did not err in admitting these statements because Rhodes can be heard directly making most of these statements during the phone call. *See Hendricks*, 408 S.C. at 530, 759 S.E.2d at 437 ("Hearsay within hearsay is admissible if each level of hearsay satisfies an exception to the hearsay rule."). As we found, the trial court did not err in concluding Rhodes's statements satisfied the excited utterance exception. Further, there was almost no lapse between Rhodes's statements and Francis's repetition of them, thus reducing the opportunity for reflection and

fabrication. *See Prather*, 429 S.C. at 583, 611, 840 S.E.2d at 566 ("[T]he intrinsic reliability of an excited utterance derives from the statement's spontaneity which is determined by the totality of the circumstances surrounding the statement when it was uttered." (alteration in original) (quoting *State v. Ladner*, 373 S.C. 103, 119-20, 644 S.E.2d 684, 693 (2007))). We find no error in the trial court's admission of the 911 call.

Further, we hold any error in the admission of the 911 call was harmless beyond a reasonable doubt. *See State v. Vick*, 384 S.C. 189, 199, 682 S.E.2d 275, 280 (Ct. App. 2009) ("Error is harmless when it could not reasonably have affected the result of the trial."); *id.* ("Appellate courts will not set aside convictions due to insubstantial errors not affecting the result."). We find Francis's statements repeating what Rhodes said during the call were cumulative to other evidence introduced at trial. *State v. Blackburn*, 271 S.C. 324, 329, 247 S.E.2d 334, 337 (1978) ("[T]he admission of improper evidence is harmless whe[n] it is merely cumulative to other evidence."). During trial, Rhodes testified about the events that occurred on the night of May 26, including the altercation between Parten and Fallous, the wreck, and Parten's actions towards her. Officer Proner testified about Rhodes's injuries, and McCarson testified Parten admitted on June 1 that he had been hiding in the woods for a few days. Thus, the substance of Francis's statements on the 911 call was cumulative to other evidence admitted at trial and therefore any error in its admission was harmless. Finally, we reject Parten's argument that pursuant to *Jolly v. State*, the 911 call improperly corroborated Rhodes's testimony and could not be harmless. 314 S.C. 17, 443 S.E.2d 566 (1994), *collectively overruled by State v. Jennings*, 394 S.C. 473, 482, 716 S.E.2d 91, 95-96 (Kittredge, J., concurring), and 394 S.C. at 483, 716 S.E.2d at 96 (Toal, C.J., dissenting). *Jolly* is inapplicable here because this case neither involved hearsay testimony corroborating the testimony of a sexual assault victim, nor did the State's case hinge on Rhodes's credibility. *See id.* at 21, 443 S.E.2d at 569 (holding "[i]mproper corroboration testimony that is *merely cumulative to the victim's testimony* . . . c[ould ]not be harmless"); *Thompson v. State*, 423 S.C. 235, 245-46, 814 S.E.2d 487, 492 (2018) (noting *Jolly* pertained to hearsay testimony identifying the defendant as the perpetrator in sexual assault cases); *see also Jennings*, 394 S.C. at 478-79, 716 S.E.2d at 93-94 (holding the trial court's error in admitting evidence that improperly corroborated the testimony of child sexual assault victims was not harmless because the "trial hinged on the children's credibility").

For the foregoing reasons, we hold the trial court did not abuse its discretion in admitting Francis's 911 call. Regardless, we find any error was harmless beyond a

reasonable doubt because the statements contained in the call were cumulative to other evidence at trial.

3.  We hold the trial court did not abuse its discretion in admitting Exhibit 7E, the photograph of the deceased's body. *State v. Lee*, 399 S.C. 521, 527, 732 S.E.2d 225, 228 (Ct. App. 2012) ("A trial court has particularly wide discretion in ruling on Rule 403 objections.").  Initially, we acknowledge the trial court did not conduct an on-the-record Rule 403 analysis; however, Parten's argument the court erred in failing to do so is unpreserved. *See State v. Dunbar*, 356 S.C. 138, 142, 587 S.E.2d 691, 693-94 (2003) ("[F]or an issue to be preserved for appellate review, it must have been raised to and ruled upon by the trial [court].  Issues not raised and ruled upon in the trial court will not be considered on appeal.").  Parten was aware the discussion concerning his Rule 403 objection was held off the record, and he failed to request that its substance be placed on the record.  Accordingly, we find Parten's argument is unpreserved for appellate review.  Nevertheless, *State v. Spears* does not require a remand in this case, nor does it prevent us from conducting a Rule 403 analysis.  403 S.C. 247, 742 S.E.2d 878 (Ct. App. 2013).  In *Spears*, this court remanded the matter to the trial court to conduct an on-the-record balancing test pursuant to Rule 403, SCRE. *Id.* at 259, 742 S.E.2d at 884.  However, *Spears* involved the admission of prior bad act evidence, and our case law requires the trial court to conduct an on-the-record Rule 403 balancing test as the second step in determining whether to admit evidence pursuant to Rule 404(b), SCRE. *Id.* at 252-53, 742 S.E.2d at 880-81; *cf. State v. King*, 349 S.C. 142, 156, 561 S.E.2d 640, 647 (Ct. App. 2002) ("Though an on-the-record Rule 403 analysis is required, this [c]ourt will not reverse the conviction if the trial judge's comments concerning the matter indicate he was cognizant of the evidentiary rule when admitting the evidence of [the defendant's] prior bad acts.").  Because this case does not involve a Rule 404(b) issue, we conclude *Spears* does not require us to remand this issue.

We find the probative value of the photograph was not substantially outweighed by the danger of unfair prejudice. *See* Rule 403, SCRE ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . .").  The photograph was relevant and probative because it corroborated Officers Carroll's trial testimony regarding law enforcement's response to the scene. *See State v. Torres*, 390 S.C. 618, 623, 703 S.E.2d 226, 229 (2010) ("It is well settled in this state that '[i]f the photograph serves to corroborate testimony, it is not an abuse of discretion to admit it.'" (alteration in original) (quoting *State v. Nance*, 320 S.C. 501, 508, 466 S.E.2d 349, 353 (1996))).  Officer Carroll testified that when he responded to the scene, he found Fallous laying

against a tree in a wooded area by the road. Officer Carroll explained that Fallous appeared to be injured and he and another responding officer cut off Fallous's shirt to try to find the wound. He testified that by the time they found Fallous's gunshot wound, he had no pulse. Officer Carroll explained the officers decided to move Fallous to the roadway to perform CPR because the terrain where they found Fallous was steep and difficult to work on. Thus, we find the photograph corroborated Officer Carroll's testimony that law enforcement moved the deceased's body from the wooded area into the roadway. Further, it appears the photograph was taken from several yards away, making it difficult to make out features of the deceased or details of the condition of the body. *See State v. Gray*, 408 S.C. 601, 616, 759 S.E.2d 160, 168 (Ct. App. 2014) ("Photos pose a danger of unfair prejudice when they have 'an undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one.'" (quoting *State v. Holder*, 382 S.C. 278, 290, 676 S.E.2d 690, 697 (2009))); *id.* at 617, 759 S.E.2d at 169 ("The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." (quoting *Old Chief v. United States*, 519 U.S. 172, 180 (1997))). Thus, we find the photograph did not have an undue tendency to suggest a decision on an improper basis and the danger of unfair prejudice was therefore very low. For the foregoing reasons, we find no error in the trial court's admission of Exhibit 7E over Parten's Rule 403 objection.

**AFFIRMED.**

**WILLIAMS, C.J., and KONDUROS and VINSON, JJ., concur.**